T.C. Memo. 2005-65

UNITED STATES TAX COURT

ESTATE OF VIRGINIA A. BIGELOW, DECEASED, FRANKLIN T. BIGELOW,
JR., EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4066-02.                    Filed March 30, 2005.

<u>Joseph F. Moore</u>, for petitioner.

<u>Donna F. Herbert</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined a $217,480.05
deficiency in the Federal estate tax of the Estate of Virginia A.
Bigelow.

Virginia A. Bigelow (decedent) established a trust
(decedent's trust) and transferred her residence to it in 1991.
The trust exchanged the residence for other real property in

1993. Decedent's trust and decedent's children formed a family limited partnership in 1994 when decedent was about age 85 and a few months after she suffered a stroke and began living in an assisted-living facility. Decedent's trust transferred the real property, but not the liability for a loan and a line of credit totaling $450,000 which were secured by the property, to the partnership. After the transfer, decedent was left with an insufficient amount of income to meet her living expenses or to satisfy her liability for the indebtedness. Decedent's sole purposes in establishing the family limited partnership were to facilitate gift giving and to reduce Federal estate tax.

The issue for decision is whether the real property that decedent's trust transferred to the partnership is included in decedent's gross estate under section 2036(a)(1). We hold that it is.[1]

Unless otherwise specified, section references are to the Internal Revenue Code in effect for the time of decedent's death in 1997, and Rule references are to the Tax Court Rules of Practice and Procedure.

_____

[1] In an amendment to the answer, respondent asserted that the property is also includable in decedent's estate under secs. 2036(a)(2) and 2038(a)(1). Because we hold that the property transferred to the partnership is included in decedent's estate under sec. 2036(a)(1), we need not decide whether the property is included in decedent's estate under sec. 2036(a)(2) or sec. 2038.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.    Decedent, Her Family, and Decedent's Estate

Decedent died testate on August 8, 1997, at the age of 88. She resided in Alhambra, California, at that time. Decedent's son, Franklin T. Bigelow, Jr. (Mr. Bigelow), is the executor of decedent's estate. He was also her attorney in fact pursuant to a durable power of attorney from 1986 until she died. Mr. Bigelow resided in Altadena, California, when the petition in this case was filed.

Decedent was survived by Mr. Bigelow, her daughter Virginia L. Burke (Mrs. Burke), and nine grandchildren. Decedent's husband had died in 1966, and her daughter Katharine B. Fitzgerald (Mrs. Fitzgerald) had died in 1996.

B.    The Sand Point Road Property

In 1963, decedent and her husband purchased as their principal residence a house on Sand Point Road (then called Spindrift Lane), in Carpinteria, California (the Sand Point Road property). Decedent became the sole owner of that property in 1966 when her husband died. She lived there until 1992.

Decedent gave each of her three children a 1/175th undivided interest in the Sand Point Road property in 1990 or 1991. The Sand Point Road property was worth $1,750,000 at that time.

C.   Decedent's Trust

In 1991, decedent executed (1) a declaration and agreement of trust (the trust agreement), which created decedent's trust, and (2) a deed transferring her remaining 98.2857-percent undivided interest in the Sand Point Road property to herself and to her son as cotrustees (the trustees) of decedent's trust.

Decedent had the power to revoke the trust during her lifetime.  The trust agreement required the trustees to distribute all of the income to or for the benefit of decedent and allowed the trustees to invade the trust corpus for decedent's care, maintenance, or support.  The assets remaining in decedent's trust when she died were to be distributed in equal shares to her three children.

Decedent suffered a stroke and was hospitalized on March 9, 1992.  After she was released from the hospital, she entered a rehabilitation center for about 6 weeks.  She then moved to an assisted-living facility in Alhambra, California.  On December 30, 1992, decedent withdrew a 1.5-percent interest in the Sand Point Road property from the trust and gave each of her daughters a 0.75-percent undivided interest in that property.

D.   The Exchange of the Sand Point Road Property for the Padaro
     Lane Property

In the fall of 1992, the trustees of decedent's trust listed the Sand Point Road property for sale with a real estate broker. In January 1993, the trustees of decedent's trust and decedent's

children (collectively the Bigelows) entered into an exchange and leaseback agreement (the exchange agreement) with Peter and Margaret Seaman (the Seamans). The Seamans owned a residence on Padaro Lane in Carpinteria (the Padaro Lane property).

Under the exchange agreement, the Bigelows agreed to transfer to the Seamans the Sand Point Road property which was worth $1,325,000, and the Seamans agreed to pay the Bigelows $125,000 and to transfer to decedent's trust the Padaro Lane property which was worth $1,200,000. The Seamans wanted to build a new house on the Sand Point Road property. As part of the agreement, the Bigelows agreed to lease the Padaro Lane property to the Seamans until the new house was completed.

Decedent's trust obtained a $350,000 loan from the Great Western Bank evidenced by a promissory note and secured by a first position deed of trust on the Padaro Lane property in favor of the bank. Decedent and Mr. Bigelow personally guaranteed the performance of decedent's trust under the purchase money promissory note. Decedent's trust used the proceeds from the Great Western Bank loan to repay two Citibank loans secured by the Sand Point Road property.

Decedent signed the exchange agreement and the deed transferring the Sand Point Road property to the Seamans. Mr. Bigelow signed the other documents, including the loan

guaranties, for himself and for decedent under the power of attorney.

The Bigelows received $68,630 from the transaction after payment of closing costs. As consideration for the sale or exchange of their interests in the Sand Point Road property, decedent's daughters each received $17,508.82, Mr. Bigelow received $7,571.32, and decedent's trust received $25,833 and the Padaro Lane property subject to the Great Western Bank mortgage. The Bigelows executed deeds transferring the Sand Point Road property to the Seamans. The trustees of decedent's trust leased the Padaro Lane property back to the Seamans. The lease provided for an initial term of 12 months and for rent of $3,500 per month.

E.   The Union Bank Line of Credit

In December 1993, decedent's trust obtained a $100,000 line of credit from Union Bank secured by a second position deed of trust on the Padaro Lane property. Decedent guaranteed the performance of decedent's trust under the line of credit.

Decedent's trust drew down $100,000 on the Union Bank line of credit between December 1993 and November 1994. Decedent's children and grandchildren received gifts of money from the proceeds of the line of credit in amounts not specified in the record. The amount owed on the Union Bank line of credit was $100,130.50 in November 1994.

F.    Spindrift Associates, Ltd. (Decedent's Family Limited
      Partnership)

In December 1994, the trustees of decedent's trust and decedent's three children executed a limited partnership agreement (the partnership agreement) which formed Spindrift Associates, Ltd., a California limited partnership (Spindrift or the partnership).  The partnership agreement stated that the purpose of the partnership was to engage in the business of owning and operating residential real property, initially the Padaro Lane property, and it prohibited the partnership from engaging in any other principal business.  The partnership agreement permitted the partnership to issue units with different rights and preferences.  Each unit represented a contribution of cash or property of $100.  "A units" were issued to limited partners in exchange for cash or checks.  "B units" were issued to limited partners in exchange for contributions of property.

Decedent's trust was both the sole general partner and a limited partner.  Decedent's three children were limited partners.  In December 1994, decedent's trust contributed $500 to the partnership in exchange for a 1-percent interest as general partner, and decedent's trust and decedent's three children each contributed $100 in exchange for one A unit.

On December 22, 1994, decedent's trust transferred the Padaro Lane property, then worth $1,450,000, but not the debt secured by the property, to the partnership in exchange for

14,500 B units. Decedent, in her capacity as grantor and beneficiary of decedent's trust, agreed to hold the partnership harmless for the Great Western Bank loan and the Union Bank line of credit. The partnership agreement required the capital account of decedent's trust to be reduced to the extent that partnership funds were used to pay any of the principal on the Great Western Bank loan or the Union Bank line of credit.

The partnership agreement allocated 1 percent of the net operating profits and losses of the partnership to the general partner and 99 percent to the limited partners. Each of the 14,504 limited partnership units was allocated an equal share (1 ÷ 14,504) of the allocation made to the limited partners.

On December 30, 1994, a certificate of limited partnership for Spindrift was filed with the California secretary of state. Around February 2, 1995, decedent's trust, as the general partner of the partnership, opened a bank account for the partnership at the Union Bank of California.

G.  The Partnership's Leasing and Sale of the Padaro Lane Property

The partnership made repairs to the Padaro Lane property after the Seamans moved out. On February 7, 1995, the partnership entered into a 24-month lease with Michael H. Healy and Tim F. Walsh (the Healy-Walsh lease) for the occupancy of the Padaro Lane property. In June 1996, the partnership engaged real estate brokers to sell the Padaro Lane property for $1,585,000.

On September 3, 1997, the partnership agreed to sell the Padaro Lane property for $1,475,000. The partnership received $949,490.33 from the sale on November 21, 1997. The partnership began distributing the proceeds to the partners, including decedent's trust, by December 1997.

H.   The Partnership's Financial Activity

All of the rental receipts from the Padaro Lane property were deposited into partnership bank accounts, and the expenses for the Padaro Lane property were paid from those accounts. Although decedent was obligated to make the monthly payments on the Great Western Bank loan, the partnership made those payments. The partnership, however, did not adjust the capital account of decedent's trust for payment of principal as required by the partnership agreement. Decedent's trust made the monthly payments on the Union Bank line of credit.

From April 6, 1995, to August 8, 1997 (when decedent died), Mr. Bigelow transferred funds between the partnership and decedent's trust 40 times. When decedent died, decedent's trust owed Spindrift $3,500. Mr. Bigelow transferred funds from decedent's trust to the partnership soon after it was formed to pay the property taxes on the Padaro Lane property. He transferred funds from the partnership to decedent's trust to

repay the earlier advances and later to pay decedent's expenses.

I.   Decedent's Gifts of Partnership Interests

In December 1994, shortly after the partnership was formed, Mr. Bigelow, under decedent's power of attorney, withdrew 5,400 B units from decedent's trust and assigned 800 units to himself and 2,300 units to each of decedent's daughters, and withdrew from decedent's trust the income rights associated with 600 B units and assigned the income rights associated with 75 B units to each of decedent's grandchildren except Eliza K. Bigelow.

In December 1995, Mr. Bigelow, under decedent's power of attorney, withdrew 600 B units from decedent's trust and assigned 200 of those units to each of decedent's children, and withdrew the income rights associated with 210 B units and assigned the income rights associated with 90 B units to Eliza K. Bigelow and the income rights associated with 15 B units to each of decedent's other grandchildren.

In December 1996, Mr. Bigelow, under decedent's power of attorney, withdrew 150 B units from decedent's trust and assigned 50 B units to himself and 100 B units to Mrs. Burke, and withdrew income rights associated with 450 B units and assigned the income rights with respect to 50 B units to each of decedent's grandchildren.

On July 18, 1997, Mr. Bigelow, under decedent's power of attorney, withdrew 100 B units from decedent's trust and assigned

those units to Mrs. Burke.  He also withdrew the income rights associated with 540 B units from decedent's trust and assigned the income rights associated with 60 B units to each of decedent's grandchildren.

Mr. Bigelow, for himself and under decedent's power of attorney, acting as trustee of decedent's trust, signed a statement of ownership in which he certified that the ownership of Spindrift limited partnership units as of July 18, 1997, was:

| Partner | A Units | B Units |
|---|---|---|
| Decedent's trust | 1 | 8,250 |
| Estate of Mrs. Fitzgerald, deceased | 1 | 2,500 |
| Mrs. Burke | 1 | 2,700 |
| Mr. Bigelow | 1 | 1,050 |
| Total | 4 | 14,500 |

He also certified that decedent's grandchildren owned the income rights associated with 1,800 B units (200 units each) owned by the general partner.  The grandchildren were not substituted as limited partners as a result of the gifts of income rights.

Disregarding the limited partnership interests associated with the income rights transferred to decedent's grandchildren, decedent's trust owned a 1-percent general partnership interest and a 45-percent $((8,250 - 1,800) \div 14,500)$ limited partnership interest in the partnership when decedent died on August 8, 1997.

J.  Termination of the Partnership

The partnership did not make any distributions to its partners with respect to their interests in the partnership

before decedent died. After decedent died, decedent's trust continued to act as the general partner of the partnership until the partnership was terminated. By December 31, 1998: (1) The partnership was terminated; (2) final distributions were made to the partners (including decedent's trust); and (3) the partnership's dissolution documents were recorded in the office of the California secretary of state.

K.   Decedent's Assets and Sources of Income

After her husband died, decedent received income from a trust that she and her husband had established in 1954 (the 1954 trust). A California trust company served as the corporate trustee of the 1954 trust. Initially, the corpus of the 1954 trust was an insurance policy on the life of decedent's husband.

When the partnership was formed in 1994, decedent had monthly income of $9,300 from the following sources:

| Source | Amount |
|---|---|
| Residential care insurance policies | |
|   Fireman's Fund/American Express | $2,100 |
|   AARP/Prudential | 1,500 |
|     Total | $3,600 |
| Rental income--Padaro Lane property | 3,500 |
| Other income[1] | 2,200 |
|   Total income | 9,300 |

[1] Veterans' Administration benefits, Social Security, U.S. Army retirement, distributions from the 1954 trust, and payments from the sale of her husband's business.

When the partnership was formed in 1994, decedent's monthly expenses were:

| Expense | Amount |
|---|---|
| Assisted living | $3,600 |
| Health insurance supplement | 150 |
| Pharmacy | 200 |
| Miscellaneous medical | 100 |
| Great Western loan | 2,000 |
| Union Bank line of credit | 750 |
| Flood and liability insurance | 350 |
| Property taxes | 1,000 |
| Storage | 150 |
| Phone and miscellaneous | 50 |
| Total | 8,350 |

After Spindrift was formed and the Padaro Lane property was transferred to the partnership, decedent no longer received the rent from the property and her income was reduced to $5,800 ($9,300 - $3,500).  Her expenses were reduced by the property taxes and insurance to $7,000 ($8,350 - $1,350), creating a shortfall of $1,200 ($5,800 - $7,000).

After the Padaro Lane property was transferred to the partnership, the partnership paid the $2,000 monthly payment on the Great Western Bank loan.

The $1,500 monthly benefit under decedent's AARP/Prudential residential care insurance policy expired in August 1995, and decedent's income was reduced to $4,300 ($5,800 - $1,500), creating a shortfall of $2,700 ($4,300 - $7,000).  The $2,100 monthly benefit under the Fireman's Fund/American Express policy expired in August 1996, and decedent's income was reduced to

$2,200 ($4,300 - $2,100), creating a shortfall of $4,800 ($2,200 - $7,000).

After the benefits under decedent's residential care insurance policies had expired, Mr. Bigelow told the trustee of the 1954 trust that decedent did not have enough income to pay her expenses. As a result, by April 1997, the trustee had distributed a total of $68,214 to decedent and terminated the 1954 trust. Mr. Bigelow and his wife received $22,000 from the funds distributed from the 1954 trust before decedent died in August 1997.

Decedent's trust had accounts at Citizens Bank. When Spindrift was formed, the total amount in those accounts was about $23,500. Decedent's trust received more than $68,000 early in 1997. When decedent died, the combined balance was about $5,500. All of the checks drawn on the Citizens Bank accounts were signed by Mr. Bigelow as trustee of decedent's trust.

L.   Tax Returns

1.   Decedent's Income Tax Returns for 1993-97

On decedent's 1993 Form 1040, U.S. Individual Income Tax Return (decedent's 1993 return), decedent reported adjusted gross income of $50,037. On Form 8824, Like-Kind Exchanges, decedent reported $25,833 as boot from the exchange of the Sand Point Road property for the Padaro Lane property. On Schedule E, Supplemental Income and Loss, decedent reported $43,750 of rental

income and $40,578 of expenses for the Padaro Lane property during that year.

On her 1994 return, decedent reported adjusted gross income of $10,284. On Schedule E, decedent reported $42,000 of rental income and $38,193 of expenses for the Padaro Lane property.

On her 1995-97 returns, decedent reported adjusted gross income of $14,918 in 1995, $38,880 in 1996, and $469 in 1997. Decedent reported her shares of partnership income or loss on those returns.

2. Partnership Returns for 1994-97

The partnership reported no income or expenses for the Padaro Lane property on its 1994 Form 1065, U.S. Partnership Return of Income (the partnership's 1994 return). The partnership's balance sheets included in the 1995-97 returns reported the Great Western Bank loan as a liability. None of the partners' Schedules K-1, Partner's Share of Income, Credits, Deductions, Etc., accurately reflect the partners' capital accounts; e.g., decedent's capital account as reported on the Schedules K-1 never shows that decedent's trust contributed the Padaro Lane property. The partnership reported income or loss and decedent's distributive shares of income and losses on its returns for 1995-97 as follows:

| Item | 1995 | 1996 | 1997 |
|------|------|------|------|
| Partnership | | | |
|   Rent | $60,500 | $54,000 | $40,500 |
|   Expenses and depreciation | (59,040) | (48,015) | (49,234) |
|   Net income (loss) | 1,460 | 5,985 | (8,734) |
| Decedent's distributive share | 525 | 2,960 | (2,896) |

3.    The Estate and Gift Tax Returns

On November 9, 1998, Mr. Bigelow, as executor of decedent's estate, signed gift tax returns for 1994-97 and decedent's estate tax return.  The gift tax returns were filed with the estate tax return.  The Internal Revenue Service received decedent's estate and gift tax returns on November 12, 1998.

a.    The Gift Tax Returns

On the gift tax returns, Mr. Bigelow reported that decedent had made taxable gifts of $463,960 in 1994, $10,785 in 1995, zero in 1996, and $2,000 in 1997.  Mr. Bigelow reported that decedent had given limited partnership interests in Spindrift to her children and grandchildren valued at $61.85 per unit in 1994 and 1995, $67.79 per unit in 1996, and $61.90 per unit in 1997.

The valuation of the limited partnership units reported on the gift tax returns was made on the basis of a market approach using the appraised value of the Padaro Lane property.  Ninety-nine percent of that value was assigned to the limited partnership interests.  The value of each unit of limited partnership interest was calculated by dividing 99 percent of the value of the Padaro Lane property by the number of limited

partnership units (14,504) and applying a 31-percent discount for lack of marketability. No distinction was made in the appraisals or on those returns between the limited partnership units given to decedent's children and the income rights given to decedent's grandchildren in the units retained by decedent's trust.

Mr. Bigelow reported on the 1994 gift tax return that decedent had made cash gifts of $10,000 to Mr. Bigelow and $10,000 to his wife, forgiven Mr. Bigelow $150,000 of indebtedness evidenced by a promissory note, and assigned interests in a promissory note payable to decedent by Mr. Bigelow to Franklin T. Bigelow III and Anna D. Bigelow, $5,000 each. He also reported on the 1995-97 gift tax returns combined cash gifts to Mr. Bigelow and his wife of $7,350 in 1995, $7,500 in 1996, and $22,000 in 1997.

### b. The Estate Tax Return

On the estate tax return, Mr. Bigelow reported a gross estate of $175,957.57 and taxable gifts of $463,070.

The amount reported as the gross estate included $10,000 of personal property, the refund of a $2,460 deposit owed to decedent by the assisted-living facility, and $163,497.57 of transfers during decedent's life. The amount reported as transfers during decedent's life included $135,079.88 for decedent's limited partnership in Spindrift; $19,912.50 for her general partnership interest in Spindrift; $5,416.83 held by

decedent's trust ($8,492.30 in a Merrill Lynch cash account offset by an overdraft of $3,075.47 in the checking account); a $169.38 cash payment due from Boston Co; and $2,918.98 in a savings account.

On the estate tax return, Mr. Bigelow reported that decedent's limited partnership interest in the partnership was worth $135,079.88. In computing that value, decedent's estate: (1) Computed 44 percent of $1,475,000 (the value of the Padaro Lane property); i.e., $649,480.85, (2) subtracted $435,069.75; i.e., the amount of the Great Western Bank loan and the Union Bank line of credit secured by the property, and (3) applied to the remainder a 37-percent discount for lack of marketability.

Attached to the estate tax return was a document signed by Mr. Bigelow called "Statement As to Status of Ownership of Units" (the statement of status), in which he certified that the ownership of the issued and outstanding Spindrift limited partnership units as of July 18, 1997, was as follows:

| Partner | A Units | B Units |
|---|---|---|
| Decedent's trust | 1 | 6,450 |
| Estate of Mrs. Fitzgerald, deceased | 1 | 2,500 |
| Mrs. Burke | 1 | 2,700 |
| Mr. Bigelow | 1 | 1,050 |
| Total | 4 | 12,700 |

The statement of status also states that, on the valuation date, decedent's nine grandchildren owned the income rights associated with 1,800 B units (200 units each) owned by the general partner.

Mr. Bigelow reported that the value of decedent's general partnership interest was $19,912.50, computed by taking 1 percent of the value of the Padaro Lane property and applying a 35-percent control premium.

OPINION

The value of an interest in property is included in a decedent's gross estate if: (1) The decedent made an inter vivos transfer of the property;[2] (2) the transfer was for less than adequate and full consideration; and (3) the decedent retained the possession or enjoyment of, or the right to the income from, the transferred property. Sec. 2036(a)(1).[3] However, a decedent's gross estate does not include property transferred

---

[2] The estate does not contend that the transfer of the Padaro Lane property by decedent's trust to Spindrift was not an inter vivos transfer by decedent for purposes of sec. 2036(a), and we conclude that it was.

[3] Sec. 2036(a)(1) provides in pertinent part:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1) the possession or enjoyment of, or the right to the income from, the property, * * *

pursuant to a bona fide sale for adequate and full consideration. Sec. 2036(a).

The estate contends that the Padaro Lane property that decedent's trust conveyed to Spindrift is not includable in decedent's estate by section 2036(a)(1) because:  (1) Decedent did not retain enjoyment of, or the right to the income from, the Padaro Lane property; and (2) the transfer of the property was a bona fide sale for adequate and full consideration.[4]  We disagree for reasons discussed next.

A.   Whether Decedent Retained Possession or Enjoyment of, or the Right to the Income From, the Padaro Lane Property During Her Lifetime

Section 2036(a)(1) does not apply unless the decedent retains the possession or enjoyment of, or the right to the income from, the transferred property.  That requirement is met if there is an implied agreement among the parties to the transaction at the time of transfer that the transferor may retain the possession or enjoyment of, or the right to the income from, the transferred property.  Estate of Thompson v. Commissioner, 382 F.3d 367, 376 (3d Cir. 2004), affg. T.C. Memo. 2002-246; Estate of Maxwell v. Commissioner, 3 F.3d 591, 594 (2d Cir. 1993), affg. 98 T.C. 594 (1992); Estate of Reichardt v. Commissioner, 114 T.C. 144, 151-152 (2000).  The estate contends

---

[4] The burden of proof shifts to the Commissioner in specified circumstances.  Sec. 7491(a).  However, our findings are not affected by the burden of proof.

that decedent did not retain or have an implied or express agreement to retain the possession, enjoyment, or right to the income from the Padaro Lane property after it was transferred to Spindrift.

1. Whether There Was an Implied Agreement That Decedent Would Retain the Right to the Income From the Padaro Lane Property During Her Lifetime

The estate contends that there was no implied agreement for decedent to retain the right to income from the Padaro Lane property. We disagree. The Padaro Lane property was generating monthly rent of $3,500. The taxes and insurance on the property totaled $1,350. After the partnership was formed, decedent used $2,000 of the $2,150 net income from the rental of the Padaro Lane property to make monthly payments on the Great Western loan. After the AARP/Prudential residential care insurance policy expired in August 1995, decedent's expenses exceeded her income by $2,700. The partnership continued to make the $2,000 payments on the Great Western loan, and Mr. Bigelow transferred partnership funds to decedent's trust to support decedent. No distributions were made to any other partner before decedent's death. Section 2036 applies if a decedent retains the right to income from the property or if there was an implied agreement to that effect. Estate of Reichardt v. Commissioner, supra at 153; Estate of Hillgren v. Commissioner, T.C. Memo. 2004-46; see Estate of Thompson v. Commissioner, supra at 375. Decedent's use

of partnership income to replace the income lost because of the transfer of the Padaro Lane property to the partnership shows that there was an implied agreement between decedent and her children that she would retain the right to the income from the Padaro Lane property.

2. <u>Whether There Was an Implied Agreement That Decedent Would Retain the Enjoyment of the Padaro Lane Property During Her Lifetime</u>

The estate contends that there was no express or implied agreement for decedent to retain the enjoyment of the Padaro Lane property. We disagree. Enjoyment includes present economic benefits. <u>Guynn v. United States</u>, 437 F.2d 1148, 1150 (4th Cir. 1971); <u>Estate of Reichardt v. Commissioner</u>, <u>supra</u> at 151. After the transfer of the Padaro Lane property to Spindrift, the property continued to secure decedent's legal obligation to pay the $350,000 Great Western Bank loan and the $100,000 Union Bank line of credit. Thus, decedent retained the economic benefit of ownership of the Padaro Lane property after it was transferred to the partnership.

We conclude that there was an implied agreement between decedent and her children that she would retain for her life the present economic benefit of the Padaro Lane property.

B.   Whether the Transfer of the Padaro Lane Property by Decedent's Trust for 14,500 B Units in Spindrift Was a Bona Fide Sale for Adequate and Full Consideration

Section 2036(a)(1) does not apply if the transfer of property was part of a bona fide sale for adequate and full consideration.  The estate contends that the transfer by decedent's trust of the fee simple interest in the Padaro Lane property to the partnership was a bona fide and genuine transfer for which decedent's trust received adequate and full consideration; i.e., 14,500 of the 14,504 limited partnership units (99.97242 percent).

To constitute a bona fide sale for adequate and full consideration, the transfer of the property must be made in good faith.  Estate of Thompson v. Commissioner, supra at 383; sec. 20.2043-1(a), Estate Tax Regs.  Such a sale requires that the transfer be made for a legitimate nontax purpose.  Estate of Bongard v. Commissioner, 124 T.C. ___, ___ (2005) (slip op. at 39).  Transactions between family members are subject to heightened scrutiny to ensure that the transaction is not a disguised gift.  See Harwood v. Commissioner, 82 T.C. 239, 258 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Stone v. Commissioner, T.C. Memo. 2003-309; cf. Estate of Reichardt v. Commissioner, supra.  As discussed next, the transfer of the Padaro Lane property to Spindrift was not made in good faith.

1.  Impoverishment of Decedent

The estate contends that the transfer of the Padaro Lane property had no adverse financial effect on decedent because she received partnership interests in the partnership that held the Padaro Lane property which were, when she received them, equal in value to the transferred property.  The estate contends that decedent's financial situation worsened only when her residential care insurance policies expired in 1995 and 1996.

We disagree.  Before the Padaro Lane property was transferred to the partnership, decedent met her financial obligations.[5]  After the transfer, decedent no longer received rent from the property, but she remained liable for both the Great Western Bank loan and the Union Bank line of credit.  The transfer of the Padaro Lane property to the partnership left decedent unable to meet her financial obligations because her reduced income of $5,800 was insufficient to pay her reduced expenses of $7,000.

After decedent's residential care insurance benefits expired in August 1996, Mr. Bigelow informed the trustee of the 1954

---

[5]  When decedent formed the partnership in 1994, she had monthly income of $9,300 ($3,600 from two residential care insurance policies, $3,500 from rent paid on the Padaro Lane property, and $2,200 from other sources).  At that time, her monthly expenses averaged $8,350 ($3,600 for assisted living expenses, $2,750 for the Great Western Bank loan and Union Bank line of credit, $1,350 for property taxes and insurance, and $650 for other expenses).

trust that decedent did not have enough income to pay her expenses. By April 1997, the trustee of the 1954 trust had distributed $68,214 to decedent and terminated the trust. Although decedent's financial needs prompted the distribution of the funds from the 1954 trust, decedent gave $22,000 to Mr. Bigelow and his wife in 1997. When she died, decedent had only $8,505 of liquid assets left to supplement her inadequate monthly income; i.e., $5,417 of assets held in decedent's trust, $169 due from Boston Co., and $2,919 in a savings account.

2.    Failure To Respect Partnership Formalities

The parties' failure to respect the provisions of the agreement governing their transaction tends to show that the transaction was not entered into in good faith. See Estate of Harper v. Commissioner, T.C. Memo. 2002-121; Riverpoint Lace Works, Inc. v. Commissioner, T.C. Memo. 1954-39.

The estate points out that formalities to establish the partnership were met and contends that any lapses in complying with partnership formalities after formation were unimportant. We disagree. Spindrift did not properly maintain records of partnership capital or the partners' capital accounts. The balance sheets included in the 1995-97 returns incorrectly show the Great Western Bank loan as a liability of the partnership. None of the partners' Schedules K-1 accurately reflect the partners' capital accounts; e.g., decedent's capital account

reported on the Schedules K-1 never reflects decedent's trust's contribution of the Padaro Lane property.  The Bigelows did not comply with all of the terms of the partnership agreement.  These facts suggest that the sale was not in good faith.

3.    No Potential for Nontax Benefit to Decedent

The transfer did not provide and had no potential to provide any nontax benefit to decedent because management of the assets did not change as a result of the transfer and there was no pooling of assets.  A transfer of assets is not a bona fide sale for estate tax purposes unless the transfer provides the transferor some benefit other than estate tax savings.  See Estate of Thompson v. Commissioner, 382 F.3d 367 (3d Cir. 2004); Estate of Harper v. Commissioner, supra.

The estate contends that transferring the Padaro Lane property to the limited partnership had three nontax purposes.  First, the estate contends that one of those purposes was to provide legal protection from creditors.  We disagree.  Transferring the Padaro Lane property to Spindrift did not give decedent's trust any additional protection from creditors because decedent's trust was the sole general partner.  As a general partner, decedent's trust was not protected from liability arising from the ownership of the property.  Limiting the liability of decedent's trust was not a purpose for forming the partnership and transferring the Padaro Lane property to it.

Second, the estate contends that the partnership provided continuity of management for the Padaro Lane property. We disagree. There was no change in the continuity of management of the Padaro Lane property after decedent's trust transferred it to Spindrift. Under the partnership agreement, the partnership terminated if the general partner terminated unless the remaining partners agreed to continue the partnership. The partnership would terminate when decedent's trust terminated because decedent's trust was the general partner. Transferring the Padaro Lane property to Spindrift did not provide any additional continuity of management of the property; the sole source of management was the trust.

Third, the estate contends that it was more efficient for decedent to give her children and grandchildren interests in the partnership than to withdraw small undivided interests in the Padaro Lane property from decedent's trust and give them to her children and grandchildren by deed. A transfer made solely to reduce taxes and to facilitate gift giving is not considered in this context to be made in good faith or for a bona fide purpose. See Estate of Thompson v. Commissioner, supra at 369, 373-374, 379.

4.    Comparison With the Kimbell Case

The estate asserts that the transfer by decedent's trust of the Padaro Lane property to Spindrift was a bona fide sale for

adequate and full consideration under <u>Kimbell v. United States</u>, 371 F.3d 257, 265 (5th Cir. 2004), where the court stated:

> In summary, what is required for the transfer by Mrs. Kimbell to the Partnership to qualify as a bona fide sale is that it be a sale in which the decedent/ transferor actually parted with her interest in the assets transferred and the partnership/transferee actually parted with the partnership interest issued in exchange. In order for the sale to be for adequate and full consideration, the exchange of assets for partnership interests must be roughly equivalent so the transfer does not deplete the estate. * * *

The estate's reliance on <u>Kimbell</u> is misplaced because the facts in that case differ substantially from those here. First, decedent's trust did not part with all of its interest in the Padaro Lane property as shown by the fact that the property continued to secure the obligations of decedent and the trust to repay the Great Western Bank loan and the Union Bank line of credit.

Second, because there was no potential benefit for decedent or her trust stemming from the transfer of the Padaro Lane property to Spindrift, the partnership interest received by decedent's trust was not equivalent to the Padaro Lane property.

Third, the general partner of the Kimbell partnership was a limited liability company, not Mrs. Kimbell's trust. When Mrs. Kimbell's trust transferred property to the partnership, the trust shielded itself from liability. In contrast, decedent's trust was the sole general partner of Spindrift. The transfer of the Padaro Lane property from decedent's trust to Spindrift did

not shield the trust from its liability as an owner of the property because decedent's trust was Spindrift's general partner.

Fourth, Mrs. Kimbell retained more than $450,000 in assets outside of the partnership for her support. In contrast, decedent did not retain enough assets to support herself.

Finally, Mrs. Kimbell did not make continuous transfers between her personal assets and the Kimbell partnership's assets. Mr. Bigelow transferred funds between decedent's trust and Spindrift 40 times from April 1995 to August 1997. Decedent's trust used partnership funds and the partnership used trust funds. The facts supporting a finding of a bona fide sale for adequate and full consideration in <u>Kimbell</u> are not present here.

C. <u>Conclusion</u>

We conclude that decedent and her children had an implied agreement that decedent could continue during her lifetime to enjoy the economic benefits of, and retain the right to the income from, the Padaro Lane property after she conveyed the property to the partnership, and that the transfer was not a bona fide sale for adequate and full consideration. Thus, the value of the Padaro Lane property is included in decedent's gross estate. See sec. 2036(a)(1).

<u>Decision will be entered for respondent</u>.