T.C. Memo. 2016-51

UNITED STATES TAX COURT

ESTATE OF SARAH D. HOLLIDAY, DECEASED,
JOSEPH H. HOLLIDAY, III, AND H. DOUGLAS HOLLIDAY, PERSONAL
REPRESENTATIVES/EXECUTORS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8143-13.                          Filed March 17, 2016.

Winston S. Evans and Joseph Allen Reynolds III, for petitioners.

Rebecca Dance Harris, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent determined a $785,019 deficiency in the

Federal estate tax of the Estate of Sarah D. Holliday (estate).  The issue remaining

for our consideration is whether the value of the assets decedent transferred to Oak

Capital Partners, LP, a limited partnership (Oak Capital), is includible in the value

[*2] of her gross estate pursuant to section 2036(a).[1] If we decide that the value of the assets is includible, we must then decide the amount of any discount due to the assets' being held in the Oak Capital entity.

FINDINGS OF FACT

Decedent was a resident of Tennessee when she died on January 7, 2009, at the age of 84. Decedent's two sons, Joseph H. Holliday III (Mr. Holliday) and H. Douglas Holliday (Dr. Holliday), are the estate's personal representatives. Dr. Holliday was a resident of Tennessee and Mr. Holliday was a resident of Connecticut when the petition was filed.

Decedent married Joseph H. Holliday, Jr., in 1946. Joseph H. Holliday, Jr., owned a heating and air conditioning wholesale business and was involved in real estate development. The Hollidays were frugal and accumulated substantial assets by the time of Joseph H. Holliday, Jr.'s death during 1999. Joseph H. Holliday, Jr.'s will directed that his assets be placed in three trusts. The income from two of those trusts was payable to decedent on a regular basis, and the principal of all three could be used for her benefit. Further, at the time of Joseph H. Holliday, Jr.'s death, decedent had substantial assets of her own.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of decedent's death. Rule references are to the Tax Court Rules of Practice and Procedure.

[*3]   Decedent continued to live in the home she had shared with Joseph H. Holliday, Jr., until it was decided that it was best she no longer live alone because she had fallen more than once and had scoliosis.  During August 2003 decedent moved to Richland Place, a nursing home, and granted Dr. Holliday and Mr. Holliday a power of attorney.  Dr. Holliday attended to decedent's day-to-day financial needs and Mr. Holliday managed her financial assets using the power of attorney.

Decedent executed Oak Capital's certificate of limited partnership and limited partnership agreement on November 30, 2006.  The limited partnership agreement describes Oak Capital's purpose in broad terms.  However, one stated purpose was to provide "a means for members of the Holliday family to acquire interests in the Partnership business and property, and to ensure that the Partnership's business and property is continued by and closely-held by members of the Holliday family."  Oak Capital's limited partnership agreement also provides that limited partners do not have the right or power to participate in Oak Capital's business, affairs, or operations.

Also on November 30, 2006, decedent executed the articles of organization of OVL Capital Management, LLC, a limited liability company (OVL Capital) and OVL Capital's operating agreement.  Following OVL Capital's formation,

[*4] decedent was the sole member. OVL Capital was created for the primary purpose of being Oak Capital's general partner.

On December 6, 2006, Oak Capital was funded with marketable securities transferred from decedent's account. A portion of this contribution was made "on behalf of" OVL Capital. The gross value of Oak Capital's assets without discount or adjustment on December 6, 2006, was $5,919,683.[2] This was the only capital contribution made to Oak Capital. In consideration for her contribution decedent received a 99.9% interest in Oak Capital as a limited partner, and OVL Capital received a 0.1% interest as a general partner.

Subsequently, also on December 6, 2006, decedent assigned her interest in OVL Capital to Mr. Holliday and Dr. Holliday in exchange for $2,959.84 from each. The aggregate price paid by Mr. Holliday and Dr. Holliday equaled the gross value of 0.1% of Oak Capital's assets on December 6, 2006, without a discount or other adjustment. Mr. Holliday and Dr. Holliday's purchase of decedent's interest in OVL Capital created the appearance that decedent had no control over the assets she transferred to Oak Capital.

---

[2]The assets were valued at the median of the highest and lowest price at which the securities publicly traded on December 6, 2006.

[*5]  After decedent's transfer of her interest in OVL Capital to Mr. Holliday and Dr. Holliday, on the same day she gave 10% of her limited partnership interest in Oak Capital to the 2006 Holliday Irrevocable Trust.  Decedent executed the 2006 Holliday Irrevocable Trust on November 30, 2006--the same day OVL Capital and Oak Capital were formed.  Following the transfer of 10% of decedent's interest in Oak Capital to the 2006 Holliday Irrevocable Trust, decedent held an 89.9% limited partnership interest in Oak Capital, which she held until her death.

At all times before decedent's death, on the day she died, and on the alternate valuation date, Oak Capital's assets consisted solely of investment assets, such as marketable securities, and cash.  Decedent held substantial assets that she did not transfer to Oak Capital.  Decedent was not involved in deciding how her assets would be held.  She left this up to Mr. Holliday, Dr. Holliday, and her attorney.  Decedent was not advised that the assets transferred to Oak Capital were selected because there was concern that someone might take advantage of her.

In March 2007 Oak Capital made a pro rata distribution of $35,000 to its partners.  This was the only distribution Oak Capital made during decedent's lifetime. Section 5 of Oak Capital's limited partnership agreement, however, provides, in part:  "To the extent that the General Partner determines that the Partnership has sufficient funds in excess of its current operating needs to make

[*6] distributions to the Partners, periodic distributions of Distributable Cash shall be made to the Partners on a regular basis according to their respective Partnership Interests."

Decedent died on January 7, 2009, and July 7, 2009, was selected as the alternate valuation date for decedent's estate as allowed by section 2032. The fair market value of all of the assets owned by Oak Capital, without discount or other adjustment, on July 7, 2009, was $4,064,759. The value of decedent's interest in Oak Capital was reported on Schedule F, Other Miscellaneous Property, of her estate's tax return as $2,428,200 as a result of discounts that were applied to her 89.9% limited partnership interest.

Respondent issued a notice of deficiency determining a $785,019 deficiency in estate tax. The parties have been able to reach agreement on all of the issues in the notice of deficiency except for respondent's determination that the value of the assets of Oak Capital is includible in the value of decedent's gross estate.

OPINION

Estate tax is imposed on the transfer of a decedent's taxable estate. Sec. 2001(a). The taxable estate consists of the value of the gross estate after applicable deductions. Sec. 2051. Except to the extent provided in sections 2033 through 2046, the gross estate includes "all property, real or personal, tangible or

**[\*7]** intangible, wherever situated." Sec. 2031(a). The value of the gross estate includes the value of such property, to the extent of the decedent's interest in it, at the time of death. Sec. 2033.

Section 2036 is intended to include in a decedent's gross estate inter vivos transfers that were testamentary in nature. United States v. Estate of Grace, 395 U.S. 316, 320 (1969); Estate of Bongard v. Commissioner, 124 T.C. 95, 112 (2005). Accordingly, a decedent's gross estate includes the value of all property that the decedent transferred but retained the possession or enjoyment of, or the right to the income from, for the decedent's life. Sec. 2036(a). This rule, however, does not apply in cases where the transfer was a bona fide sale for adequate and full consideration. Id. Section 2036(a) applies if the following three conditions are met: (1) the decedent made an inter vivos transfer of property; (2) the decedent retained an interest or right enumerated in section 2036(a)(1) or (2) or (b) in the transferred property, which the decedent did not relinquish before her death; and (3) the decedent's transfer was not a bona fide sale for adequate and full consideration. Estate of Bongard v. Commissioner, 124 T.C. at 112; Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66, aff'd, 432 F. App'x 544 (9th Cir. 2011). The parties do not dispute that decedent made an inter vivos transfer

[*8] of property, but controversy remains about whether the second and third conditions were met.

I.  Whether Decedent Retained Possession or Enjoyment of Transferred Property

"An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred." Sec. 20.2036-1(c)(1)(i), Estate Tax Regs.  This principle applies even if the retained right is not legally enforceable. Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000).  In determining whether an implied agreement exists we consider the facts and circumstances surrounding the transfer and the property's use after the transfer.  Id.; Estate of Liljestrand v. Commissioner, T.C. Memo. 2011-259.  The taxpayer bears the burden of proving that an implied agreement or understanding did not exist at the time of the transfer.  See Estate of Skinner v. United States, 316 F.2d 517, 520 (3d Cir. 1963); Estate of Reichardt v. Commissioner, 114 T.C. at 151-152; Estate of Liljestrand v. Commissioner, T.C. Memo. 2011-259.  This burden is "particularly onerous when intrafamily arrangements are involved." Estate of Maxwell v. Commissioner, 98 T.C. 594, 602 (1992), aff'd, 3 F.3d 591 (2d Cir. 1993); Estate of Rapelje v. Commissioner, 73 T.C. 82, 86 (1979).

[*9] Decedent transferred securities from her account to an account in Oak Capital's name. After the dust settled, following a series of transactions, the interests in Oak Capital were held as follows: OVL Capital held a 0.1% general partner interest; decedent held an 89.9% limited partner interest; and the 2006 Holliday Irrevocable Trust held a 10% limited partner interest. Decedent held only a limited partner interest in Oak Capital, and Oak Capital's limited partnership agreement provides that limited partners do not have the right or power to participate in Oak Capital's business, affairs, or operations.

The estate denies the existence of an implied or oral agreement that allowed decedent to retain control of the assets transferred to Oak Capital. The estate asserts that after decedent sold her interest in OVL Capital to Mr. Holliday and Dr. Holliday she did not retain possession or enjoyment of, or the right to income from, the assets that were transferred to Oak Capital. The estate further contends that decedent had no right to designate who would possess or enjoy the assets transferred to Oak Capital or the income from those assets.

Respondent, however, argues that decedent did retain possession of the property transferred to Oak Capital and that she retained a right to income from that property. Respondent asserts that section 5 of Oak Capital's limited partnership agreement evidences decedent's right to income from the assets

**[\*10]** transferred to Oak Capital. Respondent also argues that there was an implied agreement that decedent could access the income from the assets transferred to Oak Capital if necessary.

Section 5 of Oak Capital's limited partnership agreement provides that "[t]o the extent that the General Partner determines that the Partnership has sufficient funds in excess of its current operating needs to make distributions to the Partners, periodic distributions of Distributable Cash shall be made to the Partners on a regular basis according to their respective Partnership Interests." When asked at trial what he believed the term "operating needs" meant, Mr. Holliday testified: "[I]t seemed to me when I reviewed this document, when it was signed, that it was created, that this seemed to come from some sort of boilerplate for Tennessee limited partnerships, this sort of gave you broad powers to do anything you needed to do, including make distributions. But that wasn't necessary. No one needed a distribution."

Section 5 of Oak Capital's limited partnership agreement unconditionally provides that decedent was entitled to receive distributions from Oak Capital in certain circumstances. Further, Mr. Holliday's testimony makes it clear that had decedent required a distribution, one would have been made. On the basis of the facts and circumstances surrounding the transfer of assets to Oak Capital, we

[*11] believe that there was an implied agreement that decedent retained the right to "the possession or enjoyment of, or the right to the income from, the property" she transferred to Oak Capital. See sec. 2036(a)(1). Accordingly, the second condition necessary for section 2036(a) to apply has been met.

## II. Whether There Was a Bona Fide Sale for Adequate and Full Consideration

If decedent's transfer of the assets to Oak Capital was a bona fide sale for adequate and full consideration, section 2036(a) does not apply. In the context of a family limited partnership, the record must establish

> a legitimate and significant nontax reason for creating the family limited partnership, and [that] the transferors received partnership interests proportionate to the value of the property transferred. The objective evidence must indicate that the nontax reason was a significant factor that motivated the partnership's creation. A significant purpose must be an actual motivation, not a theoretical justification.

Estate of Bongard v. Commissioner, 124 T.C. at 118 (citations omitted). Section 2036(a) permits intrafamily transfers, but they are subject to heightened scrutiny. Estate of Bigelow v. Commissioner, 503 F.3d 955, 969 (9th Cir. 2007), aff'g T.C. Memo. 2005-65; Kimbell v. United States, 371 F.3d 257, 263 (5th Cir. 2004); Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66. We will first address whether there was a bona fide sale and then, if necessary, we will address whether there was adequate and full consideration.

**[\*12]** A.  <u>Whether the Transfer to Oak Capital Was a Bona Fide Sale</u>

We must determine whether decedent had a legitimate and significant nontax reason for creating Oak Capital.  The estate argues that three significant nontax business purposes prompted its creation:  first, to protect the assets from "trial attorney extortion"; second, to protect the assets from the "undue influence of caregivers"; and third, to preserve the assets for the benefit of decedent's heirs.  Respondent, however, contends that facts surrounding the creation of Oak Capital show that there was no significant nontax reason for its creation.  Respondent emphasized that the transfer was not the result of arm's-length bargaining, that Oak Capital held only cash and marketable securities, and that the terms of Oak Capital's limited partnership agreement were not followed.

### 1.  <u>Protection From Trial Attorney Extortion</u>

The estate asserts that Oak Capital was created to protect decedent's assets from litigators' claims.  Mr. Holliday contended at trial that "a personal injury lawyer might try to come after her", for example, if a roofer fell off of her roof.  Respondent points out that decedent had never been sued and that because she lived in a nursing home her risk of being vulnerable to trial attorney extortion was minimal.  Respondent asserts that this was a merely theoretical justification.

**[*13]** We are unconvinced that this was an initial motivation for Oak Capital's formation. Decedent had never been sued, and, more importantly, she continued to hold significant assets that were not transferred to Oak Capital which would have been equally enticing for a person attempting to extort something from a wealthy elderly woman. As we have in other cases where a similar purpose was asserted, we agree with respondent that this was simply a theoretical justification and was not a legitimate and significant nontax reason for Oak Capital's formation. See Estate of Liljestrand v. Commissioner, T.C. Memo. 2011-259, slip op. at 27 ("The estate simply argued, without much explanation, that holding the property in trust would jeopardize the real estate, as a creditor of a child could conceivably bring an action against one of the children and claim partial ownership of the real estate."); Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66, slip op. at 28-29 (despite taxpayers' argument that "partnerships protected the family's assets from creditors", finding no evidence that decedent "or any other partner was likely to be liable in contract or tort for any reason" and concluding that this was "purely a theoretical concern").

2. Undue Influence of Caregivers

The estate also asserts that the assets transferred to Oak Capital were selected because there was concern decedent would fall victim to the undue

[*14] influence of her caregivers. Respondent argues that there was no evidence of undue influence by decedent's caregivers and that because she was living in a nursing home the risk of such undue influence was minimal.

At trial Mr. Holliday testified about experiences decedent's cousin-in-law, Sally Jones, had had with her caregiver. Mrs. Jones lived in New York City for a little less than half of the year and in Florida the rest of the time and had no immediate family other than a grandson who was in college in Colorado. Mrs. Jones had a caregiver that walked out on her one day and would not agree to return to work until Mrs. Jones paid her $10,000. Mrs. Jones' caregiver also convinced her to hire the caregiver's family members to assist her, requested that they fly on a private medical jet when they traveled to Mrs. Jones' second home in Florida, and threatened not to accompany Mrs. Jones to Florida unless she purchased a property further inland that would be safe in the event of a hurricane. Mrs. Jones left $50,000 to the caregiver in her will.

Mrs. Jones' experiences with her caregiver were not the only negative experiences that the Holliday family had had with caregivers. After Mr. Holliday and Dr. Holliday's grandfather passed away, they discovered that the caregiver had stolen the family's heirloom silverware. Additionally, one of decedent's own caregivers had failed to show up to work but had continued to bill Dr. Holliday.

[*15] The woman was eventually caught when she failed to sign into Richland Place. Though Mr. Holliday cited these examples as reasons he was afraid decedent would fall victim to a caregiver's undue influence, he testified that he did not discuss this reason for transferring selected assets to Oak Capital with decedent.

Although it is possible for the elderly to be wrongfully targeted, the circumstances of this case do not persuade us that this was a legitimate and significant nontax reason for decedent's transfer of assets to Oak Capital. We cannot accept that experiences with Mrs. Jones' caregiver were a motivation in this case for the transfer of selected assets to Oak Capital. Decedent and Mrs. Jones were not similarly situated. Other than a grandson that lived over 1,000 miles away, Mrs. Jones had no immediate family. Decedent had two adult children who were both involved in managing her affairs, and Dr. Holliday visited her at least once a week. Mr. Holliday's testimony about how his grandfather's caregiver and his mother's caregiver had stolen from their family is also unconvincing. Theft is distinct from undue influence, and simply changing the titleholder of assets will not necessarily protect them from theft.

More importantly, Mr. Holliday testified that he did not discuss with his mother that she "might be taken advantage of" as a reason for transferring selected

[*16] assets to Oak Capital. Accordingly, there is no evidence that decedent's transfer of assets to Oak Capital was motivated by her own concern that she would become subject to the undue influence of a caregiver. We find that this was a theoretical justification for the transfer, not a legitimate and significant nontax reason.

### 3. Preservation of Assets

The final proposed justification for the creation of Oak Capital was to preserve the transferred assets for the benefit of decedent's heirs. Oak Capital's limited partnership agreement explains Oak Capital's purpose in extremely broad terms, but it also states that Oak Capital was "formed for the purposes of providing a means for members of the Holliday family to acquire interests in the Partnership business and property, and to ensure that the Partnership's business and property is continued by and closely-held by members of the Holliday family." Mr. Holliday also testified that decedent wanted to make sure that her assets were preserved for the benefit of the family.

On the basis of the facts and circumstances we are unconvinced that the formation of Oak Capital was for a legitimate and significant nontax reason. Apparently, other structures were considered but were "quickly dismissed" because they would have been difficult to manage and use to "do certain things".

**[*17]** We find these reasons unconvincing, particularly in the light of the fact that Joseph H. Holliday, Jr.'s assets were held in trusts and there were no issues with the management of these assets. Further, decedent was not involved in selecting the structure used to preserve her assets. Dr. Holliday testified at trial that decedent was "fine" with whatever he, his brother, and the attorney decided on.

4. Additional Factors Indicating the Transfer Was Not a Bona Fide Sale

As respondent points out, decedent stood on both sides of the transaction. She made the only contribution of capital to Oak Capital and held, directly or indirectly, a 100% interest in the partnership immediately after its formation. Subsequently, on the same day decedent assigned her interest in OVL Capital to her sons in exchange for its fair market value. There was no meaningful negotiation or bargaining associated with the formation of the partnership. In fact, Dr. Holliday testified that during conversations about forming the partnership decedent would agree to whatever he, his brother, and their attorney decided to do. See Estate of Turner v. Commissioner, T.C. Memo. 2011-209; Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66; Estate of Harper v. Commissioner, T.C. Memo. 2002-121. This was not an arm's-length transaction.

[*18] Oak Capital also failed to maintain books and records other than brokerage statements and ledgers maintained by Mr. Holliday. The partners did not hold formal meetings, and no minutes were kept. See Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66. As discussed above, despite the provisions of section 5 of Oak Capital's limited partnership agreement, Oak Capital made only one distribution before decedent's death. This was not the only portion of Oak Capital's limited partnership agreement that was ignored. Section 9 of Oak Capital's limited partnership agreement provides that "[e]xcept as otherwise provided in this Agreement or a separate written document executed by all of the Partners, the General Partner, or any one (1) of them shall receive reasonable compensation for managing the affairs of the Partnership." A separate written document was not introduced as evidence or discussed at trial, and no payments were ever made to OVL Capital.

Taking all of the facts and circumstances surrounding Oak Capital's formation into account, we find that decedent did not have a legitimate and significant nontax reason for transferring assets to Oak Capital. We also observe that Oak Capital held marketable securities that were not actively managed and were traded only on limited occasions. See Estate of Thompson v. Commissioner, 382 F.3d 367, 380 (3d Cir. 2004), aff'g T.C. Memo. 2002-246; Estate of Jorgensen

[*19] v. Commissioner, T.C. Memo. 2009-66.  Despite the purported nontax reasons for Oak Capital's formation, on the record before the Court, the estate has failed to show that there were significant legitimate reasons.

Because we have found and hold that there was not a bona fide sale, there remains no reason to address whether decedent received adequate compensation.

On the basis of the foregoing, we hold that the value of the assets decedent transferred to Oak Capital should be included in the value of decedent's gross estate pursuant to section 2036(a)(1).  In reaching this conclusion, we have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.  Because we have held that the value of the assets is includible in the value of the gross estate, there is no need to consider or decide the amount of any discount attributable to the limited partnership interest.

To reflect the foregoing and to account for agreements of the parties,

Decision will be entered

under Rule 155.
