T.C. Memo. 2011-259

UNITED STATES TAX COURT

ESTATE OF PAUL H. LILJESTRAND, DECEASED, ROBERT LILJESTRAND,
EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 29397-08.                    Filed November 2, 2011.

Robert E. Kolek and David T. Morris, for petitioner.

Nicholas D. Doukas, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, Judge:  Respondent determined a $2,573,171 Federal
estate tax deficiency against the Estate of Paul H. Liljestrand
(estate).  After concessions the issue for decision is whether
the value of the assets Dr. Paul H. Liljestrand (Dr. Liljestrand)

transferred to a family limited partnership are included in the value of his gross estate under section 2036(a).[1]

FINDINGS OF FACT

1.  Background

Many of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference. Dr. Liljestrand was a resident of Hawaii when he died testate on May 31, 2004, and his will was probated in that State. The estate acts through its executor, Robert Liljestrand (Robert). Robert, Dr. Liljestrand's son, resided in Hawaii when the petition was filed.

Dr. Liljestrand was born in Iowa in 1911. He obtained an undergraduate degree from Ohio Wesleyan University and a medical degree from Harvard Medical School. Upon completing medical school, Dr. Liljestrand accepted a residency at Queens Hospital in Honolulu, Hawaii. In 1939, after his residency, Dr. Liljestrand went to work at the plantation hospital in Aiea, Hawaii (hospital), where he practiced medicine as a general practitioner and surgeon.

The plantation hospital was a small community hospital that served the plantation's workers and the surrounding area's

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code, as in effect on the date of Dr. Liljestrand's death. Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded to the nearest dollar.

residents.  Some time after Dr. Liljestrand began working at the hospital, the plantation closed and the decision was made to close the hospital.  Dr. Liljestrand entered into an agreement with the plantation's owners to lease the hospital building.  Dr. Liljestrand opened a medical practice in the building and organized a not-for-profit group to operate the hospital.  A few years later Dr. Liljestrand purchased the hospital property.

Dr. Liljestrand retired from the practice of medicine in 1978.  A year later the rising cost of medical malpractice insurance forced him to sell the hospital building.  The sale was part of an exchange pursuant to section 1031.  Dr. Liljestrand exchanged the hospital property for:  (1) A mini-warehouse in Gresham, Oregon, (2) eight condominiums in Calabasas, California, (3) three buildings in the Royal Village shopping center in El Cajon, California, (4) a medical building in Mesa, Arizona, and (5) a strip mall in Sanford, Florida.

2.  Family Life

Dr. Liljestrand was married to Betty Liljestrand.  They had four children, Robert Liljestrand (Robert), Eric Liljestrand (Eric), Wendy Liljestrand (Wendy), and Lana Craigo (Lana).  Robert, after graduating from college with a degree in public health, went to work for his father at the hospital.  Robert was eventually appointed associate hospital administrator.  In that

position Robert worked closely with the hospital's business manager, Mr. Kennedy.

3.  Real Estate Business

After selling the hospital property, Dr. Liljestrand hired Mr. Kennedy to manage his newly acquired real estate business. Robert also left the hospital to work for Dr. Liljestrand in his real estate business. Robert assisted Mr. Kennedy in managing the real estate. Robert coordinated with the local onsite managers on repairs and maintenance.

For almost 30 years, Irene Easter managed the condominiums in Calabasas, California, and Dan Dellaripa managed the shopping center located in El Cajon, California. Mr. Dellaripa was an active manager. He was responsible for acquiring many of the property's leases.[2] He also coordinated the cleanup effort after a major fire on the property and was responsible for obtaining reimbursements from tenants who caused property damage.[3] The Sanford strip mall and the Gresham mini-warehouse also had local onsite managers.

In or around 1984 Mr. Kennedy began contemplating retirement. Dr. Liljestrand approached Robert about taking over

---

[2]In fact, Mr. Dellaripa signed many leases as the landlord.

[3]A previous tenant, 24 Hour Fitness, upon vacating the property left considerable damage. Mr. Dellaripa coordinated the cleanup effort and the effort to recover damages. He was successful in his efforts, obtaining $220,000 in damages from 24 Hour Fitness.

the overall management of the real estate business. Robert agreed and assumed control of the operations. Mr. Kennedy stopped making site visits, dealing with the local building managers, and making decisions regarding the properties. He remained in his role as the business' accountant until 1987, when he retired and moved to Nevada. Unable to take on the role of accountant himself, Robert found a new accountant, Annie Au (Mrs. Au).

4. Creation of Dr. Liljestrand's Revocable Trust

In 1984 Dr. Liljestrand entered into a revocable trust agreement for the "Revocable Trust of Paul Howard Liljestrand" (trust). The trust was funded with the real estate acquired in the section 1031 exchange. Dr. Liljestrand amended the trust four times, including a second restatement in 1993. The second restatement named Dr. Liljestrand and Robert as cotrustees of the trust. Dr. Liljestrand, as trustee of the trust, retained control and management over the contributed real estate. Robert as cotrustee, could take over management in the event of Dr. Liljestrand's inability to manage his affairs. Dr. Liljestrand was the sole beneficiary of the trust during his lifetime. Under the trust terms he had access to all trust income and corpus without restriction and the trustees had a duty to administer the trust solely for Dr. Liljestrand's benefit. Upon Dr. Liljestrand's death, the trust's assets were distributed to two

new trusts created for the benefit of Dr. Liljestrand's children, i.e., a trust exempt from generation-skipping transfer tax (residuary trust) and a children's trust (children's trust). Robert was named the trustee of both trusts. Both trusts would terminate upon the death of the last of Dr. Liljestrand's children to die.

5.   Management Agreement

In 1993 the trust entered into a management agreement with Robert to manage its real estate (management agreement). The management agreement provided Robert with an annual salary of $100,000 plus bonuses. This salary was Robert's primary source of income. Under the terms of the management agreement either Dr. Liljestrand or Robert could terminate Robert's employment at any time during Dr. Liljestrand's life. However, after Dr. Liljestrand's death, only Robert could terminate his employment. The management agreement was amended and restated a number of times over the years, each time with substantially the same terms.

6.   Plans To Create Limited Partnership

In April 1996 Dr. Liljestrand and Robert met with Dr. Liljestrand's estate planning attorney, Mr. Ota. According to Mr. Ota and Robert, Dr. Liljestrand wanted to leave his property to his four children equally, but he wanted to ensure Robert's continued employment as manager of the real estate. Robert had

taken on more and more responsibility with regards to the real estate business, and the other children wanted nothing to do with the business. Mr. Ota suggested that Dr. Liljestrand form a limited partnership and transfer the real estate held by the trust to the partnership.

Mr. Ota was concerned with two Hawaii statutes which in his opinion could jeopardize Robert's management of the real estate if the property remained in trust. Hawaii Revised Statutes Annotated sec. 668-1 (LexisNexis 2007)[4] allowed certain property owners to seek an action for partition in court, and Hawaii Revised Statutes Annotated sec. 554A-5(b)[5] allowed beneficiaries of a trust to void the actions of an interested trustee. Mr. Ota believed that a limited partnership was the only business entity in Hawaii that could protect against the restrictions contained

_____

[4]When two or more persons hold or are in possession of real property as joint tenants or as tenants in common, in which one or more of them have an estate in fee, or a life estate in possession, any one or more of such persons may bring an action in the circuit court of the circuit in which the property or some part thereof is situated, for a partition of the property, according to the respective rights of the parties interested therein, and for a sale of the same or a part thereof if it appears that a partition cannot be made without great prejudice to the owners. * * * Haw. Rev. Stat. Ann. sec. 668-1 (LexisNexis 2007).

[5]"If the duty of the trustee and the trustee's individual interest or the trustee's interest as trustee of another trust, conflict in the exercise of a trust power, the power may be exercised only by court authorization * * * upon petition of the trustee." Haw. Rev. Stat. Ann. sec. 554A-5(b) (LexisNexis 2007).

in the Hawaiian statutes and ensure Robert's continued management of the real estate after Dr. Liljestrand's death.

Additionally, a limited partnership could be used to satisfy Dr. Liljestrand's desire to gift interests in the real estate to his children during his life. Mr. Ota discussed various aspects of the limited partnership with Dr. Liljestrand, including the ability to gift interests and the tax consequences of forming a limited partnership.

7. Formation of PLP

In 1997 Dr. Liljestrand, in consultation with Mr. Ota, decided to form the Paul H. Liljestrand Partners Limited Partnership (PLP). Mr. Ota, unfamiliar with drafting partnership agreements, engaged a former colleague, Mickey Rosenthal, to draft the PLP agreement. It is unclear whether Mr. Rosenthal and Dr. Liljestrand had any contact before Mr. Rosenthal drafted the agreement. In order to draft the partnership agreement, Mr. Rosenthal had Dr. Liljestrand fill out a checklist. The checklist was sent to Mr. Ota, who forwarded it on to Dr. Liljestrand. Mr. Ota structured PLP on the basis of his general understanding of what Dr. Liljestrand wanted. Mr. Rosenthal met with Mr. Ota and drafted the PLP agreement in accordance with his instructions. Though Dr. Liljestrand intended his children to become partners in PLP, no child, other than Robert, participated in any discussions regarding PLP's formation.

Dr. Liljestrand and Robert signed the PLP agreement on April 4, 1997.[6]  PLP was formed on May 30, 1997, when Dr. Liljestrand and Robert filed a certificate of limited partnership with the State of Hawaii.  Dr. Liljestrand, through the trust, transferred $5,915,167[7] in real estate to PLP in exchange for his initial partnership interest.  Title to the real estate was transferred to PLP by recording deeds in the State of each property's situs.  By December 1997 these transfers were completed.  Dr. Liljestrand, through the trust, held a 99.98-percent interest in PLP.[8]  Dr. Liljestrand's children did not contribute to PLP, but

---

[6]The agreement called for a general partner and two classes of limited partners, class A and class B.  The class A limited partner was granted a preferred return.  The amount of this preferred return along with a number of other important terms was left blank in the agreement when signed by the parties.  The blanks included the total number of PLP partnership units, the number of partnership units each partner would receive, the value of each unit, and the property each partner would be required to contribute.  Dr. Liljestrand contributed:  (1) Two lots of land in Honolulu, Hawaii, (2) a condominium located in Hawaii, (3) the Gresham mini-warehouse, (4) the Sanford strip mall, (5) the El Cajon shopping center, and (6) seven condominiums in Calabasas, California.  The Hawaii condominium was encumbered by a mortgage.  The mortgage was not transferred to PLP but remained Dr. Liljestrand's personal obligation.  Additionally, many of the transferred properties were under lease at the time of transfer.  These leases were not assigned or transferred to PLP.

[7]Dr. Liljestrand, through the trust, contributed real estate with an appraised value of $12,140,000 encumbered by $6,224,833 of debt.  The partnership assumed these liabilities, resulting in a contribution of $5,915,167.

[8]Dr. Liljestrand, through the trust, was granted all 59 general partnership units, all 310 class A limited partnership units, and 5,545 units of the 5,546 class B limited partnership

(continued...)

Robert was granted 1 unit of class A limited partnership interest.

The children received their interests in PLP through gifts from Dr. Liljestrand. On January 2, 1998, the trust gifted 172 class B limited partnership units to each of four irrevocable trusts established for Dr. Liljestrand's children, representing in total 12.4 percent of the outstanding class B limited partnership units (1998 gifts). On January 4, 1999, the trust gifted 33 class B limited partnership units to each of four irrevocable trusts established for Dr. Liljestrand's children, representing in total 2.38 percent of the outstanding class B limited partnership units (1999 gifts).

It is unclear how the interests were valued. Mr. Ota hired the appraisal firm of Moss-Adams Advisory Services (Moss-Adams) to conduct an appraisal of the partnership interests in December 1997. Moss-Adams valued the partnership interests using the value of the real estate contributed in December 1997. Moss-Adams calculated a $2,140,100 fair market value for the class B limited partnership units and calculated a $5,915,200 fair market value for the class A limited partnership units. Ignoring the Moss-Adams valuation, the parties decided that the partnership should have 59 general partnership units with a value of $59,000,

---

[8](...continued)
units in exchange for the real estate.

310 class A limited partnership units with a value of $310,000, and 5,546 class B limited partnership units with a value of $2,007,652.  As a result, each of the 1998 gifts was valued at $62,092, and each of the 1999 gifts was valued at $11,913.  Each gift exceeded the $10,000 annual gift tax exclusion.  Gift tax returns were therefore required for 1998 and 1999 but were not filed until 2005, after Dr. Liljestrand's death.

8.   Operations of the Partnership

Despite having transferred legal title of the real estate to PLP, the parties continued to treat the real estate as an asset of the trust.  The partnership agreement required the partners to deposit partnership funds in a bank account opened in the partnership's name.  However, the partnership did not open a bank account until August 1999.  Thus, in 1997, 1998, and part of 1999, partnership income (i.e., the real estate income) was deposited in the trust's bank account, resulting in an unavoidable commingling of funds.  Additionally, in 1997 and 1998, Dr. Liljestrand reported the real estate income and expenses on his Form 1040, Schedule E, Supplemental Income and Loss.

The failure to treat the real estate as a partnership asset was discovered in 1999 when Mrs. Au, while preparing Dr. Liljestrand's Federal income tax returns, discovered invoices for attorney's fees relating to the formation of PLP.  At this point,

the parties applied for an employer identification number for PLP and opened a bank account in the partnership's name.  Mrs. Au also began keeping books and filing Federal tax returns for the partnership in 1999.  Rather than file amended Federal income tax returns for the years 1997 and 1998, Dr. Liljestrand and his advisers decided to treat the partnership as having commenced business on January 1, 1999, even though legal title to the real property had been transferred to the partnership by December 1997.

9.    Management of PLP

In 2001 PLP executed a management agreement with Robert, commencing January 1, 1998.  The management agreement contained substantially the same terms as the previous management agreements executed by the trust.  Shortly thereafter, the management agreement was terminated, presumably because as trustee of the trust (i.e., PLP's general partner) Robert had the authority to manage the real estate without a management contract.  Dr. Liljestrand and Robert continued to manage the real estate in the same manner before and after the transfer of the real property to the partnership.  The same onsite managers managed the properties before and after the transfer, and Robert continued to approve all major decisions and sign all checks.

10.  PLP Distributions and Payment of Personal Expenses

Dr. Liljestrand contributed almost all of his income-producing assets to PLP. He kept his home and an adjacent lot used as a driveway and a few other minor assets outside of the partnership. Dr. Liljestrand's retained assets were insufficient to pay his living expenses. Dr. Liljestrand's expenses for the years 1999, 2000, 2001, 2002, and 2003 were $81,479, $122,801, $96,807, $180,563, and $270,553, respectively. During these years Dr. Liljestrand's earnings, not including distributions from PLP, totaled $26,150, $120,382,[9] $30,652, $27,758, and $25,985, respectively. In order to offset the shortfall in Dr. Liljestrand's income, the partnership made disproportionate distributions to the trust and directly paid a number of Dr. Liljestrand's personal expenses.

The partnership agreement guaranteed the class A limited partners a 14 percent preferred return. The class A limited partnership interest was valued at $310,000. Thus Dr. Liljestrand through the trust was guaranteed an annual preferred return equal to $43,400. Moss-Adams estimated that the partnership's annual income would equal $43,000. The general partner had the exclusive right to make distributions. Distributions had to be made first to the class A limited

---

[9]This amount was significantly higher than the income for the other years because it included a one-time liquidating distribution from Partners of HI XVIII of $67,140.

partners on their preferred return, then to the general partner and the class B limited partners pro rata.

Mrs. Au began performing accounting services for the real estate business in 1987.  Mrs. Au handled the bookkeeping for the real estate and prepared the tax returns.  In 1999 she began keeping the partnership's books and preparing the partnership's tax returns.  Robert made all partnership distributions.  He would write checks during the year, and at the end of the year he would provide the check register to Mrs. Au.

Mrs. Au set up a general ledger for PLP to categorize and account for all transactions affecting the partnership assets and income beginning in 1999.  Capital accounts[10] as well as ledger accounts were established for each partner to show distributions to each partner, income received by the partnership, and expenses incurred by the partnership.  In addition, Mrs. Au set up accounts to keep track of disproportionate distributions to each partner and payment of personal expenses with partnership funds.  These accounts had various titles such as:  Property tax paid, grandchildren's gifts, and account for household employees.  These accounts were presumably necessitated in large part on

_____

[10]1999 was the first year capital accounts were maintained for PLP.  According to PLP's statement of partners' capital account prepared by Mrs. Au, the total value of all of PLP's capital accounts as of Dec. 31, 1999, was $24,203.  The partnership needed to properly maintain capital accounts because the partnership agreement called for liquidating distributions in accordance with the partners' capital accounts.

account of Robert's distribution of funds to the trust without regard for the partnership agreement. The balance in these accounts were treated as draws against each partner's capital account.

In June 2004 after Dr. Liljestrand's death Mrs. Au requested a meeting with Mr. Rosenthal to discuss PLP's accounting. During that meeting Mrs. Au learned that she had incorrectly accounted for the disproportionate distributions and payment of partner personal expenses. Mr. Rosenthal explained to Mrs. Au that these amounts should be treated as partnership receivables which the partners should repay. The record does not contain any evidence of partners repaying personal expense payments or disproportionate distributions they had received.

Between 1997 and mid-1999 there was no partnership activity except for the gifts of partnership interests to Dr. Liljestrand's children. Starting in 1999 the partnership began paying Dr. Liljestrand's personal expenses and making disproportionate distributions in his favor in order to offset the shortfall in his income. In 1999 PLP sold two of the Calabasas condominium units for $316,000, receiving $206,496 in net proceeds. Robert used the proceeds to satisfy one of Dr. Liljestrand's personal debts. In 1998 Dr. Liljestrand obtained an equity line of credit against his home with the Bank of Hawaii, withdrawing $142,500. Robert made three payments in 1999

and 2000 of $2,096, $60,000, and $107,220 in satisfaction of the liability.  That year, PLP also distributed $80,414 to the trust.  No other distributions were made that year.

In 2000 PLP distributed $43,400 to the trust, presumably in satisfaction of the guaranteed payment to the partnership's class A limited partner.  PLP made no other distributions that year.  In 2001 PLP sold the Sanford strip mall for $1,821,881 and received $160,097 in net proceeds.  That year, PLP distributed $226,718 to the trust, and the following year PLP distributed $75,552 to the trust.  No other partner received distributions in either 2001 or 2002.  In 2003 PLP sold the Gresham mini-warehouse along with accompanying personal property for $2,029,903.  PLP received $1,242,314 in net proceeds.  PLP distributed $335,807 of the net proceeds to the trust and $26,000 of the net proceeds to each of the children's irrevocable trusts.

In addition to receiving disproportionate distributions, Dr. Liljestrand also used PLP funds to pay a number of personal expenses.  The partnership paid Dr. Liljestrand's grandchildrens' tuition expenses, the cost of various gifts to his grandchildren, Dr. Liljestrand's housekeepers' salaries, various household expenses, legal service expenses for the trust, and the mortgage on the Hawaiian condominium.  Dr. Liljestrand's children also used PLP funds to pay personal expenses.  For instance, Robert obtained multiple loans from the partnership.  Robert did not

execute any promissory notes and did not repay the loans. Additionally, PLP paid Eric's and Lana's income taxes and paid for accounting services for each of their irrevocable trusts.

Dr. Liljestrand passed away on May 31, 2004. The estate filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, on August 31, 2005. The estate reported a taxable estate of $5,696,011 and tax due of $2,370,000. That same year, PLP refinanced a loan on the El Cajon property, resulting in $2,797,300 being deposited into PLP's bank account. PLP used these proceeds to satisfy Dr. Liljestrand's estate tax obligation. PLP paid Dr. Liljestrand's Federal estate tax of $2,370,000 and Dr. Liljestrand's Hawaii estate tax of $130,000.

On August 27, 2008, respondent issued the estate a notice of deficiency that determined a Federal estate tax deficiency of $2,573,171. Respondent in the notice of deficiency included in the gross estate the value of the real estate that Dr. Liljestrand had transferred to PLP. The estate filed a petition with this Court on November 21, 2008.

OPINION

I. Burden of Proof

Generally the taxpayer bears the burden of proving the Commissioner's determinations are erroneous. Rule 142(a). However, with respect to a factual issue relevant to the liability of a taxpayer for tax, the burden of proof may shift to

the Commissioner if the taxpayer has produced credible evidence relating to the issue, met substantiation requirements, maintained records, and cooperated with the Secretary's reasonable requests for documents, witnesses, and meetings.  Sec. 7491(a).

The estate argues that the burden of proof shifts to respondent under section 7491.  Our resolution of the issue is based on the preponderance of the evidence rather than the allocation of the burden of proof; therefore, we need not address the estate's arguments with respect to the burden of proof.  See Estate of Jorgensen v. Commissioner, __ Fed. Appx. __, 107 AFTR 2d 2011-2069, 2011-1 USTC par. 60,619 (9th Cir. 2011), affg. T.C. Memo. 2009-66; Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), affg. T.C. Memo. 2003-212; Polack v. Commissioner, 366 F.3d 608, 613 (8th Cir. 2004), affg. T.C. Memo. 2002-145; Knudsen v. Commissioner, 131 T.C. 185 (2008).

II.  Section 2036(a)

"'Section 2036(a) is * * * intended to prevent parties from avoiding the estate tax by means of testamentary substitutes that permit a transferor to retain lifetime enjoyment of purportedly transferred property.'"  Estate of Bigelow v. Commissioner, 503 F.3d 955, 963 (9th Cir. 2007) (quoting Strangi v. Commissioner, 417 F.3d 468, 476 (5th Cir. 2005), affg. T.C. Memo. 2003-145), affg. T.C. Memo. 2005-65.  Section 2036(a) is applicable when

three conditions are met: (1) The decedent made an inter vivos transfer of property; (2) the decedent's transfer was not a bona fide sale for adequate and full consideration; and (3) the decedent retained an interest or right enumerated in section 2036(a)(1) or (2) or (b) in the transferred property which the decedent did not relinquish before his death. If these conditions are met, the full value of the transferred property will be included in the value of the decedent's gross estate. Estate of Bongard v. Commissioner, 124 T.C. 95, 112 (2005).

A.    Whether There Was a Section 2036(a) Transfer

The estate acknowledges that Dr. Liljestrand made transfers of property to PLP. In the light of that acknowledgment, we find that Dr. Liljestrand's transfers to PLP were transfers of property under section 2036(a).

B.    Whether the Transfers Were Bona Fide Sales for Adequate and Full Consideration

Section 2036(a) excepts from its application any transfer of property otherwise subject to that section which is a "bona fide sale for an adequate and full consideration in money or money's worth". The exception is limited to a transfer of property where the transferor "has received benefit in full consideration in a genuine arm's length transaction". Estate of Goetchius v. Commissioner, 17 T.C. 495, 503 (1951). The exception is satisfied in the context of a family limited partnership

where the record establishes the existence of a legitimate and significant nontax reason for creating the family limited partnership, and the transferors received partnership interests proportionate to the value of the property transferred. The objective evidence must indicate that the nontax reason was a significant factor that motivated the partnership's creation. A significant purpose must be an actual motivation, not a theoretical justification.

By contrast, the bona fide sale exception is not applicable where the facts fail to establish that the transaction was motivated by a legitimate and significant nontax purpose. A list of factors that support such a finding includes the taxpayer standing on both sides of the transaction, the taxpayer's financial dependence on distributions from the partnership, the partners' commingling of partnership funds with their own, and the taxpayer's actual failure to transfer the property to the partnership.

Estate of Bongard v. Commissioner, supra at 118-119

(citations omitted).

We separate the bona fide sale exception into two prongs:

(1) Whether the transaction qualifies as a bona fide sale; and

(2) whether the decedent received adequate and full

consideration. Id. at 119, 122-125; see also Estate of Jorgensen

v. Commissioner, T.C. Memo. 2009-66.

> 1. Whether Dr. Liljestrand's Transfer of Assets to PLP Was a Bona Fide Sale

Whether a sale is bona fide is a question of motive. We

must determine whether Dr. Liljestrand had a legitimate and

significant nontax reason, established by the record, for

transferring his property. The estate argues that Dr.

Liljestrand had several nontax reasons for transferring his

property to PLP.  Respondent disputes the significance and legitimacy of those reasons and offers several factors to support his argument that tax savings were the primary reason Dr. Liljestrand transferred his real estate to PLP.

> a.   Dr. Liljestrand's Nontax Reasons for Forming the Partnership

The estate argues that Dr. Liljestrand had three significant nontax business purposes in forming PLP.  First, the partnership form ensured that Dr. Liljestrand's real estate would be centrally managed and that Robert would have guaranteed long-term employment as manager of the real estate.  Second, the partnership form was the only business form that would ensure that the real estate would not be subject to partition or division.  Third, the partnership form served to protect the real estate from potential creditors.  We take each of these arguments in turn.

> i.   Ensure Robert Would Continue to Manage the Real Estate

The estate argues that Dr. Liljestrand formed PLP to:  (1) Ensure that his real estate would be centrally managed by Robert and (2) guarantee Robert's long-term employment as the manager of the real estate.  Robert began helping his father manage his real estate in 1979.  By the mid-eighties Robert was overseeing management of the real estate, then held by the trust.  Robert had a management agreement and was also cotrustee of the trust.

Given the fact that Robert managed the real estate before the formation of PLP, we do not see how forming PLP ensured that Dr. Liljestrand's real estate would be centrally managed by Robert.

The estate also argues that the trust agreement and the management agreement did not ensure Robert's long-term employment as manager of the real estate, leading Dr. Liljestrand to form PLP. Robert's dual roles as manager of the real estate and trustee of the trust created a conflict of interest. Robert had a personal interest in the trust's retaining the real estate,[11] but he also had a duty as trustee of the trust to sell the real estate if beneficial for the beneficiaries. Hawaii Revised Statutes Annotated sec. 554A-5(b) provides a beneficiary of a trust the means to void the actions of a trustee where there is a conflict between the trustee's individual interests and his role as trustee.

The estate argues that Dr. Liljestrand was worried one of his children would invoke this statute after his death, jeopardizing Robert's ability to effectively manage the real estate. In order to avoid applicability of the statute, Dr. Liljestrand formed PLP.

---

[11]The management agreement provided Robert with his primary source of income. If the trust sold the real estate there would be nothing to manage and Robert would lose his primary source of income.

We do not agree with the estate that Dr. Liljestrand formed PLP with this purpose in mind.  The formation of PLP did not resolve Robert's conflict of interest or avoid application of the statute, nor did it change Robert's roles with respect to the real estate.  It simply changed the assets of the trust; instead of holding the real estate directly, the trust now held a majority of the interest in PLP.  PLP's value was based upon the value of the real estate it held.  Upon Dr. Liljestrand's death, the trust's assets (i.e., the PLP general partnership interest and the PLP class A and class B limited partnership interests) were distributed to the residuary trust and the children's trust. Robert is trustee of both trusts.  As trustee of both trusts he is also the general partner of PLP and its manager.  Robert would continue to owe a duty to the beneficiaries of both trusts to manage the real estate for their benefit.  Robert continued to hold a personal interest in the real estate and a fiduciary duty to the beneficiaries of both trusts.  PLP did not resolve Robert's conflict of interest.

### ii.  Ensure Real Estate Would Not Be Subject to Partition

The estate claims that Dr. Liljestrand formed PLP to ensure that the real estate would not be subject to partition after his death.  Under Hawaii law,

> When two or more persons hold or are in possession of
> real property as joint tenants or as tenants in common,
> in which one or more of them have an estate in fee, or

a life estate in possession, any one or more of such persons may bring an action in the circuit court of the circuit in which the property or some part thereof is situated, for a partition of the property, according to the respective rights of the parties interested therein, and for a sale of the same or a part thereof if it appears that a partition cannot be made without great prejudice to the owners.

Haw. Rev. Stat. Ann. sec. 668-1. As explained above, the real estate was originally held in the trust. The estate argues that upon Dr. Liljestrand's death, the beneficiaries of the trust or their creditors could have sued for partition of the real estate under the above statute.

The estate's argument is unconvincing. First, most of Dr. Liljestrand's real estate was outside of Hawaii and therefore was not subject to the partition statute. Of the thirteen properties contributed to PLP, only three properties were in Hawaii, two lots of land and the Hawaii condominium. The remaining 10 properties contributed to the partnership were in Oregon, Florida, and California. Dr. Liljestrand's estate planning attorney, Mr. Ota, understood that the nonHawaii properties were not subject to the Hawaii partition statute. Though Mr. Ota understood that the Hawaii statute was not applicable to these properties, he decided not to research the law of partition in Oregon, Florida, and California. The lack of such basic legal research is telling as to the significance of partition in the decision to form PLP.

Second, as discussed above, the real estate if left in the trust would be distributed to the residuary trust and the children's trust upon Dr. Liljestrand's death. The residuary trust and children's trust would hold legal title to the real estate. Neither trust would terminate until the death of Dr. Liljestrand's last living child. The trusts' beneficiaries (i.e., Dr. Liljestrand's children) would not hold the real estate as joint tenants or tenants in common and could never be joint tenants or tenants in common. As a result, the Hawaii partition statute was inapplicable. The estate claims that Dr. Liljestrand feared his children would invoke the Hawaii partition statute, yet Dr. Liljestrand had no problem leaving his home held outside the partnership to his children as joint tenants, apparently without the fear of partition.

Finally, there is no evidence that any of Dr. Liljestrand's children had any interest in seeking a partition. The estate argues that it is immaterial that there were no disputes among the children and that no child had threatened to invoke either the Hawaii partition statute or conflict of interest statute. The estate argues that the existence of both statutes created more than a mere hypothetical threat of litigation. The estate relies on Estate of Shurtz v. Commissioner, T.C. Memo. 2010-21, in support of its argument.

We disagree that there was a real threat of litigation and find the estate's reliance on Estate of Shurtz is misplaced. In Estate of Shurtz, the decedent's attorney credibly testified that he regularly advised his clients about the use of limited partnerships to protect family assets from the risks imposed by Mississippi's litigious atmosphere. Id. This was merely one of several nontax reasons for forming the family limited partnership that the Court relied on to find a bona fide sale. We do not find Mr. Ota's testimony credible regarding the litigious environment in Hawaii. Mr. Ota had never been involved in a partition and had never advised clients to form a limited partnership to avoid partition before he advised Dr. Liljestrand. We do not find the fear of partition to be a legitimate nontax purpose for forming PLP in the light of the fact that a majority of the property was outside Hawaii, the trust as written protected against the partition statutes, and no child had threatened to invoke the partition statute. In fact, this Court has previously found that the fear of partition without an actual threat of litigation is not a significant nontax purpose.[12]

---

[12]Estate of Bigelow v. Commissioner, 503 F.3d 955, 972 (9th Cir. 2007) ("we also reject the proffered nontax rationale that the formation of * * * [the partnership] would serve to protect the Padaro Lane property from a partition sale. There was no evidence that any of the Bigelow children or grandchildren contemplated such an action, or that any of the Bigelow children or grandchildren had creditors which might resort to such a forced sale."), affg. T.C. Memo. 2005-65.

### iii. Provide Additional Creditor Protection

The estate argues that Dr. Liljestrand formed PLP to protect the real estate from potential creditors. We are skeptical. There is no evidence that Dr. Liljestrand or any of the other PLP partners was concerned with creditor claims. The estate failed to name a single creditor or even establish an activity or pattern of activity by the partners which could open them up to potential liability. The estate simply argued, without much explanation, that holding the property in trust would jeopardize the real estate, as a creditor of a child could conceivably bring an action against one of the children and claim partial ownership of the real estate. The estate argued that PLP protected against such actions.

### b. Factors Indicating the Transfers Were Not Bona Fide Sales

#### i. Disregard of Partnership Formalities

The partnership failed to follow even the most basic of partnership formalities. To begin with, PLP failed to open and maintain a separate bank account for the first 2 years of its existence. During this period all of PLP's banking was conducted through the trust's bank account, resulting in an unavoidable commingling of partnership and personal funds.

The parties testified that there had been only one partnership meeting since its formation. There were no other

formal meetings between the partners, and no minutes were ever kept. Dr. Liljestrand and Robert often failed to treat the partnership as a separate entity. Dr. Liljestrand used partnership assets to pay personal expenses. He used partnership assets to pay his housekeepers and personal secretary, pay off the equity line of credit taken on his home, pay the mortgage on the Hawaii condo which was a personal liability, pay his grandchildren's tuition, and pay the taxes and the expense of accounting services for his children. The commingling of personal funds with partnership funds suggests that the transfer of property to a family limited partnership was not motivated by a legitimate and significant nontax reason. Estate of Reichardt v. Commissioner, 114 T.C. 144, 152 (2000).

Additionally, PLP failed to make the required proportionate distributions as required under the partnership agreement. During the years 1999 through 2002 Dr. Liljestrand was the only partner to receive distributions from the partnership, even though his children each held over a 3-percent interest in the partnership. Except for the distribution in 2000, these distributions greatly exceeded the $43,400 guaranteed distributions that were due to Dr. Liljestrand as a class A limited partner.

Furthermore, Dr. Liljestrand was financially dependent upon partnership distributions to maintain his lifestyle and pay his

everyday expenses.  Dr. Liljestrand's expenses for the years
1999, 2000, 2001, 2002, and 2003 were $81,479, $122,801, $96,807,
$180,563, and $270,553, respectively.  During these years Dr.
Liljestrand's earnings, not including distributions from PLP,
totaled $26,150, $120,382, $30,652, $27,758, $25,985,
respectively.  Without the partnership distributions Dr.
Liljestrand would have been unable to cover his personal
expenses.  A taxpayer's financial dependence on distributions
from the partnership suggests that the transfer of property to a
family limited partnership was not motivated by a legitimate and
significant nontax reason.  Estate of Thompson v. Commissioner,
T.C. Memo. 2002-246, affd. 382 F.3d 367 (3d Cir. 2004); Estate of
Harper v. Commissioner, T.C. Memo. 2002-121.

PLP also made a number of loans to its partners.  Robert
borrowed money from the partnership on a number of occasions.  He
never executed any promissory note and never repaid these loans.
Rather Mrs. Au treated these loans as draws against his capital
account, even though doing so violated the partnership's
requirement that distributions be pro rata.

### ii. Whether the Transfers to PLP Were at Arm's Length

Where a taxpayer stands on both sides of a transaction, we
have concluded that there is no arm's-length bargaining and thus
the bona fide transfer exception does not apply.  E.g., Estate of
Jorgensen v. Commissioner, T.C. Memo. 2009-66; Estate of Strangi

v. Commissioner, T.C. Memo. 2003-145; Estate of Harper v. Commissioner, supra. On the other hand, we have found an arm's-length bargain in the intrafamily context when the interests of the family members were sufficiently divergent. E.g., Estate of Stone v. Commissioner, T.C. Memo. 2003-309. Although intrafamily transfers are permitted under section 2036(a), they are subject to heightened scrutiny. Estate of Bigelow v. Commissioner, 503 F.3d at 969; Kimbell v. United States, 371 F.3d 257, 263 (5th Cir. 2004).

Dr. Liljestrand stood on all sides of the transaction. He formed and fully funded PLP. He received 100 percent of the general partnership interests, 100 percent of the class A limited partnership interests, and 99.98 percent of the class B limited partnership interests (5545 units out of 5546 units). Besides Dr. Liljestrand, only Robert received a partnership interest at the time of formation, 1 unit of the class B limited partnership interests. Robert did not make a capital contribution in exchange for this 1 unit of partnership interest.[13] Dr. Liljestrand made the entire capital contribution to the

---

[13]The estate argues that Robert contributed $362 for his 1 unit of class B limited partnership interest. PLP did not have a bank account at its formation. PLP conducted its business through the trust's bank account for its first 2 years of existence. The estate has failed to provide any financial records verifying Robert's contribution of $362 to PLP or the trust's bank accounts. Given the circumstance, we do not believe Robert made an actual cash contribution to PLP equal to the interest he received.

partnership with his contribution of the real estate. Though Robert was an initial partner, he failed to obtain counsel separate from his father. The only attorneys involved in the formation of PLP were Dr. Liljestrand's attorneys.

Although Dr. Liljestrand contemplated all four of his children's becoming partners in PLP, Dr. Liljestrand did not consult with Eric, Lana, or Wendy when forming the partnership. Dr. Liljestrand's attorneys testified that they formed PLP solely to address Dr. Liljestrand goals. They also testified that before PLP's formation they had no contact with Eric, Lana, or Wendy.

### c. Conclusion With Respect to Whether the Transactions Were a Bona Fide Sale

Taking into account the totality of the facts and circumstances surrounding the formation and funding of the partnership, on the preponderance of the evidence we conclude that Dr. Liljestrand did not have a legitimate and significant nontax reason for transferring his assets to PLP, and therefore these were not bona fide sales. We find especially significant that the transactions were not at arm's length and that the partnership failed to follow the most basic of partnership formalities. Although the estate recites a number of purported nontax reasons for the formation and funding of the partnership, we are skeptical of their true role in the formation of PLP.

Therefore, we find that the estate has failed to establish that any of the stated reasons were significant and legitimate.

### 2. Whether the Transactions Were for Adequate and Full Consideration

The general test for deciding whether transfers to a partnership are made for adequate and full consideration is to measure the value received in the form of a partnership interest to see whether it is approximately equal to the property given up. Kimbell v. United States, supra at 262; Estate of Bongard v. Commissioner, 124 T.C. at 118; Estate of Jorgensen v. Commissioner, supra. Under Kimbell v. United States, supra at 266, we focus on three things:

> (1) whether the interests credited to each of the partners was proportionate to the fair market value of the assets each partner contributed to the partnership, (2) whether the assets contributed by each partner to the partnership were properly credited to the respective capital accounts of the partners, and (3) whether on termination or dissolution of the partnership the partners were entitled to distributions from the partnership in amounts equal to their respective capital accounts. * * *

Respondent disputes that the transfers were made for adequate and full consideration.

### a. Whether the Interests Credited to Each of the Partners Was Proportionate to the Fair Market Value of the Assets Each Partner Contributed to the Partnership

The estate argues that each partner received an interest in PLP proportionate to the fair market value of the property each contributed to PLP. The partnership engaged Moss-Adams to

calculate the value of the class A and class B limited partnership interests in PLP using the value of the total property being contributed. The trust contributed its California, Florida, Oregon, and Hawaii properties with a total net value of $5,915,167 to PLP, in exchange for all 59 general partnership units, all 310 class A limited partnership units, and 5,545 of the 5,546 class B limited partnership units. Moss-Adams calculated a $2,140,100 fair market value for the class B limited partnership units and calculated a $5,915,200 fair market value for the class A limited partnership units.

Ignoring the Moss-Adams valuation, the parties valued the 59 general partnership units at $59,000, the 310 class A limited partnership units at $310,000, and 5,545 class B limited partnership units at $2,376,290. The trust exchanged $5,915,167 worth of real estate for partnership interests valued at $2,376,290. Given the valuations before us, we find it difficult to find the trust received an interest in PLP proportionate to the fair market value of the assets contributed.

Moreover, the estate claims Robert contributed $362 in cash to PLP in exchange for 1 class B limited partnership unit with a stated value of $362. We find no evidence in the record to suggest Robert actually contributed $362 to the partnership. We find especially significant the fact that PLP did not maintain a bank account for its first 2 years of existence, leaving no

account in which to deposit the contribution.  Without some evidence of an actual contribution of $362 in cash, we find that Robert has been credited with a partnership interest disproportionate to the fair market value of property contributed.

Under these circumstances, we conclude that the interests credited to each of the partners were not proportionate to the fair market value of the assets each partner contributed to the partnership.

> b.    Whether the Assets Contributed by Each Partner to the Partnership Were Properly Credited to the Respective Capital Accounts of the Partners

The estate argues that the assets contributed by each partner were properly credited to their respective capital accounts.  We disagree.  The trust contributed its real estate to PLP in December 1997.  However, PLP did not begin keeping track of its partners' capital accounts until June 1999 at the earliest.  Additionally, the evidence introduced by the estate fails to support their argument.  The estate introduced into evidence PLP's statement of partners' capital account (capital account statement) for the year ended December 31, 2000. According to the capital account statement the total value of all of PLP's capital accounts as of December 31, 1999 was $24,203. The trust had contributed $5,915,167 worth of real estate to the PLP in 1997.  This contribution is not reflected in the capital

accounts as of December 31, 1999. On the basis of the foregoing, we conclude that the assets contributed by each partner were not properly credited to their respective capital accounts.

c. <u>Whether on Termination or Dissolution of the Partnership the Partners Were Entitled to Distributions From the Partnership in Amounts Equal to Their Respective Capital Accounts</u>

The estate argues, and we agree, that upon termination of the partnership the partners were entitled to distributions from PLP in amounts equal to their respective capital accounts.

d. <u>Conclusions With Respect to Whether the Transactions Were for Adequate and Full Consideration</u>

Having concluded that: (1) The interests credited to each partner were not proportionate to the fair market value of the assets contributed by the partner, and (2) the assets contributed by each partner were not properly credited to their respective capital accounts, we conclude that Dr. Liljestrand did not contribute the real estate to PLP for adequate and full consideration. We find especially significant that PLP failed to maintain capital accounts upon formation of the partnership in 1997 and used neither the values established in the Moss-Adams appraisal nor the fair market value of the real estate to establish the value of each partner's PLP interest.

Having concluded that the transfer was not a bona fide sale for adequate and full consideration, we now turn to the issue of

whether Dr. Liljestrand retained the possession or enjoyment of, or the right to income from, the property he transferred to PLP.

   C.   Whether Dr. Liljestrand Retained the Possession or Enjoyment of, or the Right to the Income From, the Property He Transferred to PLP

"An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred."  Sec. 20.2036-1(a), Estate Tax Regs. "The existence of formal legal structures which prevent de jure retention of benefits of the transferred property does not preclude an implicit retention of such benefits."  Estate of Thompson v. Commissioner, 382 F.3d 367, 375 (3d Cir. 2004), affg. T.C. Memo. 2002-246; Estate of McNichol v. Commissioner, 265 F.2d 667, 671 (3d Cir. 1959), affg. 29 T.C. 1179 (1958); Estate of Bongard v. Commissioner, 124 T.C. at 129.

The existence of an implied agreement is a question of fact that can be inferred from the circumstances surrounding a transfer of property and the subsequent use of the transferred property.  Estate of Bongard v. Commissioner, supra at 129.  We have found implied agreements where:  (1) The decedent used partnership assets to pay personal expenses, e.g., Estate of Rosen v. Commissioner, T.C. Memo. 2006-115; (2) the decedent transferred nearly all of his assets to the partnership, e.g., Estate of Reichardt v. Commissioner, 114 T.C. 144 (2000); (3) the

decedent's relationship to the assets remained the same before and after the transfer, e.g., id.; Estate of Rosen v. Commissioner, supra; and (4) the partnership served as an alternate vehicle through which the decedent was able to provide for his children at his death, e.g., Estate of Harper v. Commissioner, T.C. Memo. 2002-121.

Although Dr. Liljestrand retained some assets outside the partnership, we find he lacked sufficient funds outside of the partnership to maintain his lifestyle and satisfy his future obligations. Dr. Liljestrand contributed almost all of his income-generating property to PLP. Respondent alleges that the transfer left Dr. Liljestrand with inadequate assets and cashflow to meet his living expenses. The estate counters respondent's assertion by claiming that Dr. Liljestrand retained his home and could easily have borrowed against his interest in PLP and the house to support himself.

The estate relies on the Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74, in arguing that Dr. Liljestrand had retained sufficient assets outside of PLP. In Estate of Mirowski, the Commissioner argued that the decedent did not retain sufficient assets outside of the partnership to meet her anticipated financial obligations. The Court disagreed, finding that Mrs. Mirowski had retained $7.5 million of personal assets that she did not transfer to the partnership, including $3.3 million in

cash and cash equivalents.  These assets were more than sufficient to cover her personal expenses.  With regard to her anticipated gift tax liability, the Court found that Mrs. Mirowski had the ability to satisfy such liability with the distributions she would receive from the partnership and through her ability to borrow against her personal assets, including her partnership interest.

The estate in comparing the instant case to Estate of Mirowski, relies primarily on the fact that Dr. Liljestrand could borrow against his home and did in fact borrow $142,500 against his home.  We believe Estate of Mirowski is distinguishable from the instant case.  In Estate of Mirowski, the decedent retained $7.5 million outside of the partnership, more than enough to satisfy her personal expenses.  Dr. Liljestrand, on the other hand, did not retain sufficient assets outside of PLP to satisfy his personal expenses, as demonstrated by the fact that PLP paid a number of Dr. Liljestrand's personal expenses, including his housekeepers' salaries and grandchildrens' tuition.  Moreover, we find the estate's reliance on Dr. Liljestrand's actually borrowing against the equity line of credit to be disingenuous. PLP repaid this equity line of credit, not Dr. Liljestrand.  In fact, the partnership sold two properties in order to raise the funds necessary to make the payments.

Additionally, PLP refinanced a loan in order to pay $2,370,000 and $130,000 to the U.S. Government and the State of Hawaii, respectively, to satisfy Dr. Liljestrand's estate tax obligations. The use of a significant portion of partnership assets to discharge obligations of a taxpayer's estate is evidence of a retained interest in the assets transferred to the partnership. See Estate of Rosen v. Commissioner, supra; Estate of Korby v. Commissioner, T.C. Memo. 2005-103, affd. 471 F.3d 848 (8th Cir. 2006); Estate of Thompson v. Commissioner, T.C. Memo. 2002-246. "[P]art of the 'possession or enjoyment' of one's assets is the assurance that they will be available to pay various debts and expenses upon one's death." Strangi v. Commissioner, 417 F.3d at 477.

The estate attempts to downplay the significance of the direct use of PLP funds to pay Dr. Liljestrand's personal expenses by claiming that such distributions were properly accounted for as draws against Dr. Liljestrand's capital account. To the extent that the estate's arguments focus on accounting manipulations, they are unavailing. Robert and Annie Au, PLP's accountant, each testified that accounting adjustments were made at yearend after monies had actually been distributed. Accounting entries made by Mrs. Au were a belated attempt to undo Dr. Liljestrand's receipt of disproportionate distributions. After-the-fact paperwork by Dr. Liljestrand's accountant does not

refute the implied understanding that Dr. Liljestrand could continue to use and control the partnership property during his life.  The accounting adjustments do not preclude a conclusion that those involved understood that Dr. Liljestrand's assets would be made available as needs materialized.  See Estate of Reichardt v. Commissioner, supra at 154-155; Estate of Harper v. Commissioner, supra.

Respondent also cites the fact that Dr. Liljestrand's commingled personal and partnership funds.  This fact was one of the most heavily relied upon in both Estate of Reichardt v. Commissioner, supra at 152, and Estate of Schauerhamer v. Commissioner, T.C. Memo. 1997-242.  The PLP agreement specified: "All funds of the Partnership shall be deposited in its name in such checking and savings accounts, certificates' of deposit, United States government obligation or other short-term interest bearing accounts with institutions selected by the General partner".  Yet no such account was opened until August 1999, almost 2 years after the entity began its legal existence. Before that time, partnership income was deposited in the trust's account, resulting in an unavoidable commingling of funds.

We also consider the partnership distributions in determining whether there was an implied agreement to retain possession of the transferred assets.  As part of the partnership agreement, Dr. Liljestrand was guaranteed a preferred return of

14 percent of the value of his class A limited partnership interest. Dr. Liljestrand's class A limited partnership interest was valued at $310,000, thus Dr. Liljestrand was guaranteed annual payments equal to $43,400. Moss-Adam's appraisal estimated the partnership's annual income would equal $43,000. We find this guaranteed return indicative of an agreement to retain an interest or right in the contributed property.

In addition to the preferred returns, the partnership distributions were heavily weighted in favor of Dr. Liljestrand. According to PLP's reconciliation reports, for the years 1999 through 2002, PLP distributed to the trust $80,414, $43,400, $226,718, and $75,552, respectively. PLP made these distributions to Dr. Liljestrand without making a distribution to any other partner.

In addition to arguing that such distributions were accounted for as draws against the trust's capital account, the estate also argues that the distributions to the trust were consistent with PLP's guaranteed payment obligation. We find that this argument has little credibility given that only the 2000 payment was for the guaranteed payment amount. The record supports a conclusion that in making the payments Robert was not concerned with meeting PLP's guaranteed payment obligation but rather was concerned with Dr. Liljestrand's support. The disproportionate distributions provide further evidence of an

implied agreement to retain possession or enjoyment of the transferred assets.

Lastly, we focus on the testamentary characteristics of the partnership arrangement. While we acknowledge that PLP did come into existence before Dr. Liljestrand's death and that some change ensued in the formal relationship of those involved to the assets, we are satisfied that any practical effect during decedent's life was minimal. Rather, the partnership served primarily as a testamentary device through which decedent would provide for his children at his death.

The motivation for PLP's formation is admittedly postmortem. The record is devoid of any significant change in Dr. Liljestrand's relationship with the assets before his death. Dr. Liljestrand received a disproportionate share of the partnership distributions, engineered a guaranteed payment equal to the partnership expected annual income, and benefited from the sale of partnership assets. The objective evidence points to the fact that Dr. Liljestrand continued to enjoy the economic benefits associated with the transferred property during his lifetime. With regards to Dr. Liljestrand's motivation for forming PLP, Dr. Liljestrand was concerned with the disposition of his property after death. The estate claims he wanted to protect the property from partition and guarantee Robert's management of the property after his death. These motives are primarily testamentary in

nature. The objective and subjective evidence lead to a conclusion that the partnership was simply a vehicle for controlling Dr. Liljestrand's property after his death.

In summary, we are satisfied that PLP was created principally as an alternate testamentary vehicle to the trust. Taking this feature in the light of all the factors discussed above, we conclude that Dr. Liljestrand retained enjoyment of the contributed property within the meaning of section 2036(a).

D.  Conclusion With Respect to Whether the Values of the Assets Transferred to PLP Are Includable in the Value of the Gross Estate

On the record before us, we find that:  (1) Dr. Liljestrand transferred assets to PLP within the meaning of section 2036, (2) the transfer was not a bona fide sale for adequate and full consideration, and (3) Dr. Liljestrand retained enjoyment of the transferred assets.  Therefore, we conclude that pursuant to section 2036(a)(1), the value of the Dr. Liljestrand's gross estate includes the values of the assets Dr. Liljestrand transferred to PLP.

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.